**UNITED STATES of America, Appellee,**

v.

**Ruben PEREA, Defendant–Appellant.**

**No. 100, Docket 92–1188.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1992.

Decided Feb. 11, 1993.

Jeffrey Toobin, Asst. U.S. Atty., Brooklyn, NY (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Emily Berger, Asst. U.S. Atty., on the brief), for appellee.

Ivan S. Fisher, New York City (Kenneth M. Tuccillo, on the brief), for defendant-appellant.

Before: KEARSE, PRATT, and McLAUGHLIN, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Ruben Perea appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York following his conditional plea of guilty before Edward R. Korman, *Judge*, to one count of conspiracy to distribute cocaine and marijuana, in violation of 21 U.S.C. § 846 (1988). Perea was sentenced principally to 16 months' imprisonment, to be followed by three years' supervised release. On appeal, he contends that the district court should have granted his motion to suppress certain statements and evidence as the fruits of an illegal search and arrest. For the reasons below, we vacate the judgment and remand for further proceedings in connection with the suppression motion.

## I. BACKGROUND

The present prosecution arises out of the February 1, 1991 search of a bag seized from the trunk of a livery cab and the arrest of Perea, a passenger in the cab, in the course of an investigation by agents of the United States Customs Service ("Customs") and the United States Drug Enforcement Agency ("DEA") into money laundering. The following description is drawn largely from testimony of the agents and others at a hearing on Perea's motion to suppress, *inter alia*, certain of his statements and the contents of the bag.

### A. The Events Prior to the Appearance of Perea

In about November 1990, Customs agents had commenced surveillance of a residential building at 97–37 Corona Avenue, Queens, New York ("Corona building"), that they had determined was being used as a "count house" where proceeds of narcotics sales were counted before transfer to other locations. On January 28, 1991, agents observed two men in a red Oldsmobile arrive at the Corona building. The men had beepers and made several calls from a nearby pay telephone. They eventually went into the building with a shopping bag; some 12 minutes later, they emerged without the bag. Agents attempted to follow as the men drove away but were thwarted as the driver engaged in a variety of evasive tactics.

On January 30, agents observed the same Oldsmobile arrive at the Corona building. Again the occupants made calls from a pay phone before one of them went into the building. This time when the men drove away, agents were able, despite the driver's maneuvers, to follow them. After stopping at various locations in Queens to make calls from pay telephones, the men arrived at 136–20 61st Road, Queens, and the driver went into that building ("61st Road building"). A grey Nissan was parked in the driveway.

On January 31, the agents conducted surveillance of the 61st Road building. They saw in the driveway a car that was registered to an individual with prior narcotics arrests. In the evening, a man and a woman arrived in the grey Nissan that the agents had seen there the previous day.

On the morning of February 1, agents resumed surveillance of the 61st Road building, and the Nissan was again parked in the driveway. At about 9:50 a.m., a man later identified as Hernan Ortiz left the

building and drove off in the Nissan. Agents followed as he drove to the Long Island Expressway, made a call from a telephone booth, returned to the Nissan and drove along the expressway for some miles, then exited, parked the car, and walked away. One agent continued to watch the Nissan; another apparently attempted to follow Ortiz but lost sight of him. Ortiz was next seen arriving back at the 61st Road building by livery cab at about 11:45 a.m.

In the meantime, an agent posted outside the 61st Road building had seen the red Oldsmobile arrive at about 11:05. The driver rang the doorbell, without apparent response. He threw pebbles at a second-floor window and seemed to make gestures toward someone there. He then appeared to look for surveillance, got in the Oldsmobile, and sped away.

## B. *The Arrest of Perea*

When Ortiz arrived back at the 61st Road building at 11:45 a.m., he left the livery cab, appeared to check for surveillance, and then entered the building. The cab remained waiting. Several minutes later, Ortiz returned to the cab with a large duffel bag that appeared to be full and heavy. He looked up and down the street, then signaled the cab driver to open the trunk. Ortiz placed the bag in the trunk of the cab and returned to the building.

A few minutes later, Perea appeared in the doorway of the 61st Road building with Ortiz. Perea left the building, appeared to check for surveillance, and then got into the cab. During this entire time, Perea had his left hand in his pocket, leading a surveilling agent to suspect that he had a weapon in the pocket. The cab pulled away, and the agent contacted other Customs and DEA agents in the area, who joined in following the cab.

During the pursuit, Perea kept looking back. He appeared to be nervous and to be urging the driver of the cab to drive evasively, and the agents became fairly certain that Perea knew he was being followed. Agents in at least four, and as many as six, vehicles used their flashing lights and sirens to stop the cab. Government cars then blocked the cab in front and back and on one side, and the agents approached the cab, some with guns drawn. Precisely what followed was the subject of conflicting testimony at the suppression hearing.

Perea testified that an agent got out of one of the cars, pointed a revolver at him, and told him not to move. Other agents surrounded the cab, and one opened the door and pulled him out. The agent placed Perea against the side of the cab, searched him, then "put [him] down hard on the ground." Agents handcuffed him while he was on the ground, and then placed him inside a government vehicle. In the meantime, while Perea was on the ground, other agents had taken the duffel bag from the trunk of the cab. He testified that the agents placed the bag in the car with him and questioned him about "a second person." In response to a question from the court, Perea testified that the agents never asked him whether the bag belonged to him.

Perea testified that he had been keeping the duffel bag in his apartment for a person who was to pay him for holding it. Perea said he knew the bag contained cocaine, marijuana, and a scale, and that he had possessed the bag for four days before he was arrested. On February 1, Ortiz came to Perea's apartment to warn him of surveillance and instructed him to take the bag to a new location in the livery cab.

Two Customs agents testified at the hearing. Special Agent Brian Aryai testified that he had simply asked Perea to leave the vehicle and did not physically pull him from the cab. The other agent who testified could not recall whether or not anyone had physically removed Perea from the cab.

Aryai testified that while Perea was getting out of the cab, another agent asked the driver whether he could search the cab's trunk. The driver agreed and gave the keys to the agent, who then found the duffel bag in the trunk. Aryai escorted Perea to the back of the cab and asked him whether the bag was his. On direct examination Aryai testified that Perea said "no,

that's not my bag"; on cross-examination, he testified that Perea's response was "no, go ahead." The agents opened the bag and found some 75 pounds of marijuana, 1100 grams of cocaine, and a triple-beam scale. Aryai then placed Perea under arrest, frisked and handcuffed him, and read him his *Miranda* warnings. Thereafter, Aryai interrogated Perea in one of the agents' cars. Perea told Aryai that the duffel bag contained narcotics and money and that he had also concealed money in the back seat of the cab. Later in the day, the agents searched the back seat and found approximately $13,000 in cash.

Lucy Flowers, the livery cab driver, also testified. She said that when her cab arrived at the 61st Road building, Ortiz left the cab without paying and told her he would be back shortly. When he emerged from the building carrying a bag, he signaled Flowers to open the trunk, which she did from inside the vehicle. She could not see what he put in the trunk. Ortiz told Flowers to wait, and he returned to the building. Several minutes later, Perea got into the cab and told her to start driving; he said he would pay Ortiz's fare. As Flowers started to drive, she was apprehensive because of the way Perea was holding his hand in his pocket and the way he kept turning to look behind them.

When Flowers heard the sirens, she pulled to the side of the road thinking the officers were pursuing some other car. After government cars blocked the cab, agents approached, opened the rear door and, without explanation to Flowers, got Perea out of the cab. Flowers was not sure whether they forcibly removed him, because she did not turn around. The agents did not ask Flowers for permission to search the trunk. Rather, one demanded that she give him the key to the trunk, and she complied; the agent then removed the duffel bag from the trunk.

Flowers testified that she saw Perea lying on the ground, handcuffed. Uncertain of the sequence of events, however, because "everything happened to[o] fast," she at first testified that Perea was handcuffed before the officers opened the trunk, but later said that she thought he was handcuffed after the agents opened the trunk.

## C. *The Denial of the Suppression Motion*

Perea and Ortiz, who was arrested shortly after the events involving Perea, were indicted on one count of conspiring to distribute and to possess with intent to distribute marijuana and more than 500 grams of cocaine, one count of possessing cocaine with intent to distribute, and one count of possessing marijuana with intent to distribute. Perea, in support of his motion to suppress the contents of the duffel bag, the money found in the back seat of the cab, and his statements to the agents, argued, *inter alia*, that the degree of force used to effectuate the stop was so great that the stop should be treated as an arrest, and that since the information possessed by the agents did not rise to the level of probable cause, the arrest was unlawful. In response to the government's challenge to his standing to challenge the search of the duffel bag, Perea argued that he had standing as a bailee. The government contended that Perea had abandoned the bag by telling the agents it was not his. With respect to this contention, which Perea disputed, the district court stated during the hearing, "I don't decide this on the question of abandonment. My view of abandonment may be somewhat different than the higher court's view of it, but I don't find that he abandoned." (Hearing Transcript, June 21, 1991, at 7.)

Without mentioning the abandonment contention again, the district court denied the suppression motion on other grounds. First, in a Memorandum and Order dated June 24, 1991 ("June Memorandum"), it ruled that though Perea, as a passenger, had standing to challenge the stop of the cab, the testimony at the suppression hearing "plainly demonstrate[d] that there was present the reasonable suspicion necessary to effect a forcible stop." June Memorandum at 1. The court declined, however, to decide whether the force used in the stop was so great as to constitute an arrest, for

which probable cause would have been required, stating that

> the critical fact is that nothing followed from the alleged excessive use of force. The subsequent search of the trunk of the taxi resulted from the stop the law enforcement officers had every right to make and not from the manner in which the stop was effected. The result might be otherwise if the validity of the search depended on the consent of the driver or the defendant.... Because the validity of the subsequent search does not depend on such consent, there is no need to question the judgment of the law enforcement officers as to the degree of force appropriate in stopping a car that they had reason to suspect was engaged in crime of which violence is often an integral part.

*Id.* at 2.

The court ruled that Perea had no standing to challenge the search of the cab's trunk because he did not have a reasonable expectation of privacy in the trunk. Noting that the cab did not belong to Perea and that the "trunk was simply a temporary storage place for a duffel bag during a brief taxi ride," the court ruled that Perea "had no more of an expectation of privacy in the trunk of the taxi than the defendant in *Rawlings v. Kentucky*, 448 U.S. 98[, 100 S.Ct. 2556, 65 L.Ed.2d 633] (1980), had in the pocketbook of his friend in which he placed narcotics." June Memorandum at 2–3.

The court ruled that Perea also had no reasonable expectation of privacy in the duffel bag itself, stating that

> I do not credit his testimony regarding either the length of time the bag had been in his custody or what he was doing with it at the time of its seizure. Even under his version of the events, however, it is conceded that the bag and its contents did not belong to him and that he was a temporary custodian of the duffel bag. At best, the record suggests that Mr. Perea was simply hired to transport the bag from one location to another. Because he does not assert any facts remotely suggesting that he had any ex-

pectation of privacy in the contents of the bag, the search did not violate any expectation of privacy that the defendant had in the duffel bag or its contents. *Id.* at 3.

Finally, in a one-page order dated July 26, 1991, the court denied Perea's motion to suppress the money seized from the back seat of the cab and his statements to the agents, stating as follows:

> At the time defendant told the arresting officers that the money was hidden in the back of the livery, there was probable cause for his arrest. Even if the initial seizure of the defendant on the basis of reasonable suspicion is characterized as an arrest without probable cause, the subsequent statements made after probable cause was established (and the fruits of those statements) need not be suppressed. *See Johnson v. Louisiana*, 406 U.S. 356, 365[, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152] (1972).

### D. *The Conditional Plea*

Following the denial of Perea's suppression motion, Perea and Ortiz were tried in a four-day trial. Perea was convicted on all counts. The jury acquitted Ortiz on the conspiracy count and cocaine possession count, and was unable to reach a verdict on the marijuana possession count.

Perea then moved for a new trial on the ground that he and Ortiz should not have been tried together because they had raised inconsistent defenses. After the district court indicated that it was inclined to grant the motion, the government and Perea entered into a plea-and-cooperation agreement. Perea was to be allowed to enter a conditional plea of guilty to conspiracy to distribute marijuana and an unspecified quantity of cocaine, which carried a lower penalty than the more–than–500–gram cocaine conspiracy charged in the indictment. Ortiz eventually pleaded guilty to the marijuana possession count, and Perea testified for the government at a *Fatico* hearing held with respect to the sentencing of Ortiz (*United States v. Fatico*, 603 F.2d 1053, 1057 & n. 9 (2d Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755

(1980); *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir.1978)).

Thereafter, with the approval of the court, Perea entered a conditional plea of guilty to the lesser conspiracy charge, reserving the right to appeal the denial of his suppression motion. Though the imprisonment range recommended by the federal Sentencing Guidelines for the offense to which Perea eventually pleaded guilty was 51–63 months, in light of his cooperation he was sentenced, as indicated above, to 16 months' imprisonment, to be followed by a three-year term of supervised release. This appeal followed.

## II. DISCUSSION

■ On appeal, Perea contends that the district court erred in denying his suppression motion, arguing principally (1) that he had a reasonable expectation of privacy in (a) the livery cab trunk and (b) the duffel bag, and (2) that the stop of the cab was tantamount to an arrest, for which probable cause was required but was lacking. The contention that Perea had a reasonable expectation of privacy in the cab's trunk does not require extended discussion. He did not have the right to exclude others from the trunk; the driver had a greater right than he to look into the trunk, to place other objects in it, or to remove other objects from it. Nor would Perea have had the right to prevent the driver from letting other persons place objects in the trunk or remove objects, other than the duffel bag, from it. Hence, we agree with the district court's ruling that Perea could have no reasonable expectation of privacy in the trunk. *See United States v. Paulino*, 850 F.2d 93, 97 (2d Cir.1988), *cert. denied*, 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989). Other issues raised by Perea, however, are more troublesome.

■ A warrantless search is " 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d

576 (1967)). In support of a motion to suppress evidence found in a warrantless search, the defendant must show that he had a reasonable expectation of privacy in the place or object searched. *See, e.g., California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988); *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986); *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). If such a privacy interest is established, the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *United States v. Kon Yu–Leung*, 910 F.2d 33, 41 (2d Cir.1990); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981). In the present case, the district court ruled that Perea lacked any reasonable expectation of privacy in the duffel bag, and it did not reach questions as to whether there was an applicable exception to the warrant requirement. We conclude that the denial of the suppression motion cannot be sustained on the basis adopted by the district court, and that further proceedings are therefore required.

### A. *Perea's Expectation of Privacy in the Bag*

■ In general, a defendant may establish that he had a right protected by the Fourth Amendment by showing (a) that he had an expectation of privacy that society is prepared to recognize as reasonable, and (b) that he had conducted himself and dealt with the property in a way that indicated a subjective expectation of privacy. *See, e.g., California v. Greenwood*, 486 U.S. at 39, 108 S.Ct. at 1628; *California v. Ciraolo*, 476 U.S. at 211, 106 S.Ct. at 1811; *Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). One need not be the owner of the property for his privacy interest to be one that the Fourth

Amendment protects, so long as he has the right to exclude others from dealing with the property.

Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and *one who* owns or *lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.* *Rakas v. Illinois,* 439 U.S. at 144 n. 12, 99 S.Ct. at 431 n. 12 (emphasis added). For example, one who, with permission of the owner, is in possession of and "ha[s] complete dominion and control over" a residence that is not his own home, "and c[an] exclude others from it," *id.* at 149, 99 S.Ct. at 433 (discussing *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980)), "can have a legally sufficient interest ... so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place," *Rakas v. Illinois,* 439 U.S. at 142, 99 S.Ct. at 429. A person who possesses personalty belonging to another and who has the right to exclude third persons from possession of that property has an interest that is likewise protected. *See, e.g., United States v. Ochs,* 595 F.2d 1247, 1253 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

■ A bailee has the right—and often the duty—to exclude others from possession of the property entrusted to him. *See generally* Dobie, *Handbook on the Law of Bailments and Carriers* § 61, at 133 (1914) (right); *id.* § 65, at 157–58 (duty); Story, *Commentaries on the Law of Bailments* § 422a, at 421 (4th ed. 1846) (right); *id.* § 457, at 465–66 (duty). "As to everybody except the true owner of" the bailed property, the bailee "ha[s] the right of the owner to have and defend its custody and

direct possession." *Foulke v. New York Consolidated Railroad Co.,* 228 N.Y. 269, 275, 127 N.E. 237 (1920). And with respect to that property, the bailee, whether gratuitous or for hire, has some duty of care. *See, e.g., Voorhis v. Consolidated Rail Corp.,* 60 N.Y.2d 878, 879, 470 N.Y.S.2d 364, 365, 458 N.E.2d 823, 823 (1983) (gratuitous bailee must avoid gross negligence; gross negligence presumed from nonreturn of property); *Aronette Manufacturing Co. v. Capitol Piece Dye Works, Inc.,* 6 N.Y.2d 465, 468, 190 N.Y.S.2d 361, 364, 160 N.E.2d 842, 844 (1959) (bailee for mutual benefit must exercise ordinary care). Further, even if he would not be liable to the bailor, the bailee has a sufficient possessory interest to permit him to "recover for the wrongful act of a third party resulting in the loss of, or injury to, the subject of the bailment." *Rogers v. Atlantic, Gulf & Pacific Co.,* 213 N.Y. 246, 258, 107 N.E. 661 (1915).

■ Accordingly, in the Fourth Amendment context, bailees can have a sufficient interest in bailed property to give them standing to object to its seizure or search. *See, e.g., United States v. Benitez–Arreguin,* 973 F.2d 823, 827–28 (10th Cir.1992); *Robles v. State,* 510 N.E.2d 660, 663 (Ind. 1987), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2872, 101 L.Ed.2d 907 (1988); *State v. Casey,* 59 N.C.App. 99, 296 S.E.2d 473, 482 (1982); *State v. Grundy,* 25 Wash.App. 411, 607 P.2d 1235, 1237–38 (1980), *review denied,* 95 Wash.2d 1008 (1981); *see also United States v. Oswald,* 783 F.2d 663, 666 (6th Cir.1986) ("suitcase or briefcase is property of a kind in which the owner or bailee normally has a strong expectation of privacy"). *See generally* 4 LaFave, *Search and Seizure* § 11.3(f), at 344 (2d ed. 1987) ("person who is not the owner of the container but who possesses it by virtue of his status as bailee certainly has standing to object to illegal interference with his possessory interest").

In *Benitez–Arreguin,* the defendant was an itinerant worker who had been given a duffel-type bag to deliver to a person who was to help him get a job. The Tenth Circuit noted that "[i]n general, luggage

such as suitcases and footlockers is 'a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy,' " 973 F.2d at 828 (quoting *Arkansas v. Sanders,* 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979), *overruled on other grounds, California v. Acevedo,* —— U.S. ——, —— – ——, 111 S.Ct. 1982, 1988–91, 114 L.Ed.2d 619 (1991)), and ruled that the defendant had established his possessory interest in the bag as a bailee, *see Benitez–Arreguin,* 973 F.2d at 828. Noting " 'the general rule that a bailee in possession of personal property may recover compensation for any conversion of the article bailed or destruction of or damage to the bailed property, by another while in his possession,' " *id.* (quoting 8 Am.Jur.2d *Bailments* § 263, at 994 (1980)), the court concluded that "a person transporting luggage as a bailee, or at least with the permission of the owner, has a reasonable expectation of privacy that society would recognize." 973 F.2d at 828. We agree.

■ In the present case, we cannot uphold the district court's rejection of the claim that Perea had a protectable privacy interest as the duffel bag's bailee. The court noted that if his testimony were to be believed, Perea was "a temporary custodian," who was "[a]t best ... simply hired to transport the bag from one location to another"; the court stated, however, that it could not credit Perea's testimony as to "either the length of time the bag had been in his custody or what he was doing with it at the time of its seizure." We are not entirely sure of the scope of this rejection. The court did not state that it found that Perea was not the custodian of the bag, and the record does not lend itself to a rejection of the proposition that he was at least its temporary custodian. At the time of the stop, Perea was the only passenger in the cab; he and Ortiz had appeared together at the door of the 61st Road building after Ortiz put the bag into the trunk and just before Perea departed in the cab with Ortiz's apparent blessing. There could be no reasonable inference that the bag had been abandoned by Ortiz; nor was there any evidence that Ortiz had appointed Flowers custodian of the bag or that he had even told her where it was to be taken. We are also unclear as to the basis for the court's rejection of Perea's description of "what he was doing with [the bag] at the time of its seizure." The government presented no evidence to contradict Perea's testimony that he was taking the duffel bag to a new location; that testimony was plainly supported by the agents' observations of the events after Ortiz returned to the 61st Road building. Further, even accepting the court's rejection of Perea's testimony as to the length of time the bag had been in his custody, we cannot see that that factor has any relevance. Whatever the length of time for which Perea had previously had custody of the bag, there could be no question that he had custody of it when the cab was stopped. We conclude that the record established that Perea was a bailee of the duffel bag.

In rejecting Perea's claim of a privacy interest in the bag, the district court cited *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, and *United States v. McGrath,* 613 F.2d 361 (2d Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980). Neither case stands for the proposition that a bailee such as Perea lacks a protectable privacy interest. In *Rawlings,* the Supreme Court held that a defendant who placed narcotics in a friend's purse did not have standing to object to the search of the purse because he did not have a legitimate expectation of privacy in the purse. *See* 448 U.S. at 105–06, 100 S.Ct. at 2561–62. The case thus involved the privacy expectations of the narcotics' owner who had relinquished custody, *i.e.,* the bail*or;* it did not involve the privacy interests of the person in whose purse the narcotics had been placed, *i.e.,* the bail*ee.* In *McGrath,* this Court considered the search of a briefcase found next to its owner, a passenger in a van; the search was challenged both by the driver and by the owner of the van who was not present at the time the van was stopped and the briefcase seized. We held that neither the owner of the van nor the driver had standing to challenge the search of the briefcase. *See* 613 F.2d at

365–66. There was no showing that the briefcase had ever been out of the possession of its owner, or that it had been entrusted to any one else, or that the driver or the owner of the van had any dominion or control over the briefcase. We thus ruled that only the passenger who owned the briefcase had a protectable privacy interest in it. In sum, neither the defendant in *Rawlings* nor either of the defendants at issue in *McGrath* was a custodian of the bag that was searched.

As to the requirement that Perea have conducted himself and dealt with the property in such a way as to indicate a subjective expectation that his privacy would be preserved, the agents' own testimony served to prove that element. Given their descriptions of Ortiz's and Perea's repeated glancing about for surveillance, there can be no doubt that Perea and Ortiz had exhibited subjective expectations of privacy and were attempting to preserve that privacy.

In sum, on the facts clearly established at the suppression hearing in the present case, Perea as bailee had, at the time the cab was stopped, a protectable expectation of privacy in the duffel bag.

This conclusion, however, does not end the privacy-interest inquiry, for if Perea abandoned his possessory interest in the bag or consented to the search, the search did not violate his Fourth Amendment rights. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. at 219, 93 S.Ct. at 2044 (consent); *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960) (abandonment). At the suppression hearing, Perea testified that he was not even asked whether the bag was his. Agent Aryai testified that Perea had been asked whether the duffel bag was his; Aryai gave two versions of Perea's response, testifying first that Perea had said, "no, that's not my bag," and testifying later that Perea had said, "no, go ahead." The government does not appear to have argued that Perea consented to the search; rather, it argued that Perea had abandoned the bag. The court stated during the suppression hearing that though its view of abandonment might differ from that of the appellate court, "I don't find that he abandoned." We interpret that statement as a ruling that the government had not established that Perea abandoned whatever interest he had in the bag—a ruling that, on this record, is not erroneous. If the court did not so intend its statement, however, it is free to make a ruling on this question on remand.

If Perea did not consent to the search and did not abandon the duffel bag, he retained his Fourth Amendment protected privacy interest in the bag, and the court was required to proceed to the question of whether there was a basis on which the warrantless search was permissible.

B. *The Search of the Bag, and Questions as to Probable Cause*

Assuming that Perea retained a protectable privacy interest in the duffel bag, the court should nonetheless deny his motion to suppress if it concludes that an exception to the warrant requirement made the search lawful. If, for example, there was probable cause for the search of the bag, the search was lawful under the "automobile exception." *See California v. Acevedo,* — U.S. at —, 111 S.Ct. at 1991 ("police may search [a container found in a car] without a warrant if their search is supported by probable cause"). We note that if there was probable cause for the search of the bag, the arrest of Perea was also lawful because "the same probable cause to believe that a container holds drugs will allow the police to arrest the person transporting the container." *Id.* at —, 111 S.Ct. at 1989.

Applicability of other exceptions to the warrant requirement, such as the exceptions for a search incident to arrest and for an inventory search, would depend in part on the lawfulness of Perea's arrest. *See, e.g., Smith v. Ohio,* 494 U.S. 541, 543, 110 S.Ct. 1288, 1290, 108 L.Ed.2d 464 (1990) (per curiam) (incident to arrest); *Illinois v. Lafayette,* 462 U.S. 640, 648, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) (inventory search); *United States v. Jenkins,* 876 F.2d 1085, 1089 (2d Cir.1989) (same). A warrantless arrest is unlawful absent prob-

able cause. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 208 & n. 9, 99 S.Ct. 2248, 2254 & n. 9, 60 L.Ed.2d 824 (1979). Thus, if the court concludes that the agents did not have probable cause to search the bag, in order to determine whether the search of the bag was lawful on one of these two grounds the court will be required to decide whether the agents had probable cause to arrest Perea without reference to the contents of the bag. *See Smith v. Ohio*, 494 U.S. at 543, 110 S.Ct. at 1290 (it is " 'axiomatic that an incident search may not precede an arrest and serve as part of its justification' ") (quoting *Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968)); *see generally Smith v. Ohio*, 494 U.S. at 543, 110 S.Ct. at 1290 (an attempt to justify " 'the arrest by the search and at the same time … the search by the arrest,' just 'will not do' ") (quoting *Johnson v. United States*, 333 U.S. 10, 16–17, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948)).

▮▮▮ We should note that even assuming that the agents had probable cause to arrest Perea without having probable cause to search the bag, we have considerable doubt as to whether the search could be justified as one that was incident to a lawful arrest. The justification for that exception is the need to ensure that the person arrested not have access to a weapon or to destructible evidence. *See New York v. Belton*, 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981); *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). Thus, upon arrest, the officers may search "the arrestee's person and the area 'within his immediate control.' " *Id.* Where the item to be searched is not within reasonable reach of the person arrested, the rationale for application of this exception is absent. *See, e.g., United States v. Lasanta*, 978 F.2d 1300, 1305 (2d Cir.1992) (incident-to-arrest exception not applicable to search of vehicle when arrest occurred on doorstep of home). Thus, in *New York v. Belton*, though the Supreme Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile," 453 U.S. at 460, 101 S.Ct. at 2864 (footnote omitted), it went on to state, "[o]ur holding encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk," *id.* at 461 n. 4, 101 S.Ct. at 2864 n. 4. Accordingly, several lower courts have held that the incident-to-arrest exception does not permit the search of items in the trunk of a vehicle in which an arrestee was traveling. *See, e.g., United States v. Wright*, 932 F.2d 868, 878 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *United States v. Thompson*, 906 F.2d 1292, 1298 (8th Cir.), *cert. denied*, 498 U.S. 989, 111 S.Ct. 530, 112 L.Ed.2d 540 (1990); *United States v. Hernandez*, 901 F.2d 1217, 1220 (5th Cir. 1990). Further, arresting agents are not allowed to simulate circumstances warranting application of the incident-to-arrest exception merely by bringing the item they wish to search into the area near the person arrested, or vice versa. *See, e.g., United States v. Hill*, 730 F.2d 1163, 1167 (8th Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984); *United States v. Wright*, 577 F.2d 378, 381 (6th Cir.1978); *United States v. Rothman*, 492 F.2d 1260, 1266 (9th Cir.1973).

▮▮▮ Since in the present case the duffel bag was in the trunk of the cab, we see no basis on which it could properly be deemed to have been within Perea's reasonable reach at the time of the stop. And the agents could not make the incident-to-arrest exception applicable simply by placing Perea and the bag near each other after they arrested Perea and opened the trunk.

▮▮▮ The rationale underlying the exception for inventory searches is different. When a person is arrested in a place other than his home, the arresting officers may "impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area." *Cabbler v. Superintendent, Virginia State Penitentiary*, 528 F.2d 1142, 1146 (4th Cir.1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 60, 50 L.Ed.2d 77 (1976);

see also United States v. Grill, 484 F.2d 990, 990–91 (5th Cir.1973) (officers allowed to take arrested individual's luggage from airplane in order to protect it), cert. denied, 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974); 2 LaFave, Search and Seizure § 5.5(b), at 537 (2d ed. 1987) (appropriate for arresting officers to take custody of property that the arrested individual may otherwise be unable to retrieve). After such an arrest and seizure, an inventory search of the property seized is justified by the government's interests in averting any danger the property might pose, in protecting the property from unauthorized interference, and in protecting itself against claims of theft or negligent treatment of the property. See Colorado v. Bertine, 479 U.S. 367, 373, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987). Thus, if there has been a lawful arrest and an immediately ensuing search is not justifiable as incident to the arrest, a motion to suppress the proceeds of the immediate search may nonetheless be denied if the contents would inevitably have been discovered in a permissible inventory search. See United States v. Jenkins, 876 F.2d at 1088–89; United States v. Gorski, 852 F.2d 692, 696–97 (2d Cir.1988).

If there was probable cause to arrest Perea without reference to the contents of the bag but not probable cause to search the bag, the agents would have been justified in taking the bag to their headquarters rather than leaving it in Flowers's cab. Accordingly, the contents of the bag may be admissible if the court finds that they would inevitably have been discovered as part of a valid inventory search of the bag subsequent to Perea's lawful arrest.

The district court did not make findings as to any of the factual matters needed to resolve the lawfulness of Perea's arrest or of the search of the duffel bag. These questions remain for determination on remand.

 In passing, we note our agreement with the district court's ruling that the initial stop of the livery cab was not an arrest but rather was a Terry stop (Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) that was lawful be-cause the agents, given their surveillance observations, had a reasonable suspicion of criminal activity. The fact that agents have used their cars to block a vehicle does not necessarily mean that, instead of a Terry stop, there was a de facto arrest. See, e.g., United States v. Vasquez, 638 F.2d 507, 522 (2d Cir.1980) (no arrest where one car blocked rear of car stopped behind civilian vehicle at red light), cert. denied, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981); United States v. Lechuga, 925 F.2d 1035, 1041 (7th Cir.1991) (same where two cars blocked stopped vehicle); United States v. Jackson, 918 F.2d 236, 238 (1st Cir.1990) (same); see also 3 LaFave, Search and Seizure § 9.2(d), at 364 (2d ed. 1987) (an "otherwise valid stop is not inevitably rendered unreasonable merely because the suspect's car was boxed in by police cars in order to prevent it from being moved"). But see United States v. Marin, 669 F.2d 73, 81 (2d Cir.1982) (participation of four or five official cars in stop of defendant's vehicle, along with other factors, led to conclusion that stop constituted an arrest); United States v. Ceballos, 654 F.2d 177, 180, 184 (2d Cir.1981) (same where at least three official cars participated). Nor does the fact that the officers approached a stopped car with guns drawn in order to protect themselves and bystanders on the street necessarily transmute a Terry stop into an arrest. See United States v. Alexander, 907 F.2d 269, 272 (2d Cir.1990) ("law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists"), cert. denied, —— U.S. ——, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991).

Nonetheless, an encounter that began as a permissible Terry stop may have ripened into an arrest, which must be supported by probable cause, if, for example, the officers unreasonably used means of detention that were more intrusive than necessary. See, e.g., Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion); Dunaway v. New York, 442 U.S. at 212–14, 99 S.Ct. at 2256–57;

*Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991); *United States v. Alexander*, 907 F.2d at 272–73. In assessing whether the degree of restraint was " 'too intrusive to be classified as an investigative detention,' " *Posr v. Doherty*, 944 F.2d at 98 (quoting *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir.1989)), we have considered in general the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, *see, e.g., United States v. Marin*, 669 F.2d at 81, and in particular such factors as the number of agents involved, *see, e.g., id.;* whether the target of the stop was suspected of being armed, *see, e.g., United States v. Alexander*, 907 F.2d at 272; the duration of the stop, *see, e.g., United States v. Hooper*, 935 F.2d 484, 495 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); and the physical treatment of the suspect, *see, e.g., United States v. Marin*, 669 F.2d at 81 (suspects pulled from car), including whether or not handcuffs were used, *see, e.g., United States v. Jackson*, 652 F.2d 244, 250 (2d Cir.) (fact that suspect was not handcuffed supported ruling that treatment was not an arrest), *cert. denied*, 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981); *cf. United States v. Esieke*, 940 F.2d 29, 36 (2d Cir.) (whether detained and guarded traveler suspected of alimentary canal smuggling could be handcuffed without probable cause presented "extremely close case"), *cert. denied*, —— U.S. ——, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991). *See also United States v. Miller*, 974 F.2d 953, 957 (8th Cir.1992) (use of handcuffs did not transform *Terry* stop into arrest where agents were outnumbered by suspects); *United States v. Hastamorir*, 881 F.2d at 1557 (same).

Here, Perea testified that he was dragged from the cab, though Aryai denied this; the other agent who testified stated that she could not remember whether or not Perea had been pulled out. Perea also testified that he was immediately frisked, handcuffed, and thrown to the ground. Aryai testified, in contrast, that the sequence of events was Perea's voluntary exit from the cab, his abandonment of the bag, the agents' search of the bag, the arrest and frisking of Perea, and the application of the handcuffs. The factual issues, which may affect the court's determination of whether the search was lawful, remain unresolved.

In sum, on remand, if the court does not find that Perea abandoned the bag or consented to its search, it should conclude that he retained a protectable privacy interest in the bag. If he retained that privacy interest, the court should grant the motion to suppress the contents of the bag unless it concludes that the search was permissible by reason of an exception to the Fourth Amendment's warrant requirement.

C. *Admissibility of the Statements and the Cash*

Perea's motion to suppress encompassed not only the contents of the duffel bag but also the cash eventually seized from the back seat of the cab and his postarrest statements to the agents; the latter included the statement that the bag contained narcotics and the revelation that he had hidden the cash in the cab. The admissibility of this evidence will depend largely on the lawfulness of Perea's arrest, which in turn depends on the answers to questions to be addressed on remand. Since the lawfulness of the arrest remains to be determined, we do not address here questions that may arise upon the decision of that issue.

We are, however, constrained to note our disagreement with the district court's reliance on *Johnson v. Louisiana*, 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972), for its ruling that the statements and the cash should not be suppressed even if the statements were made after an unlawful arrest because by the time the statements were uttered probable cause had emerged. *Johnson* was significantly different from the present case. The evidence challenged there was the identification of the defendant from a lineup; the Supreme Court found that any taint resulting from the allegedly unlawful arrest had been purged because in the in-

terval between the arrest and the lineup the defendant had been arraigned before a magistrate who informed him of his rights, and at the time of the lineup he was represented by counsel. We need not address at this time whether authority other than *Johnson* may support denial of this part of the suppression motion even if the arrest was unlawful.

## CONCLUSION

The judgment of conviction is vacated, and the matter is remanded to the district court for further proceedings not inconsistent with this opinion.