06-5648-cr
USA v. Valentine

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: April 4, 2008

Decided: August 5, 2008
Amended: August 18, 2008)

Docket No. 06-5648-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

LUIS VALENTINE,

*Defendant-Appellant*.

_____

Before:

CALABRESI and LEVAL, *Circuit Judges*, and NEVAS, *District Judge*.[*]

_____

Appeal from an order of the District Court for the Eastern District of New York (Dora Irizarry, *District Judge*) denying defendant Luis Valentine's motion to suppress evidence seized in his apartment after his arrest and from the sentence imposed after Valentine pleaded guilty to one count of being a felon in possession of a firearm.

VACATED and REMANDED for further proceedings consistent with this opinion.

_____

[*] The Honorable Alan H. Nevas of the United States District Court for the District of Connecticut, sitting by designation.

COLLEEN P. CASSIDY, Federal Defenders of New York, Inc., Appeals Bureau, New York, New York, *for Defendant-Appellant.*

EMILY BERGER, Assistant United States Attorney (Daniel A. Spector, Assistant United States Attorney, *on the brief*), *for* Benton J. Campbell, United States Attorney for the Eastern District of New York, New York, New York, *for Appellee.*

NEVAS, *District Judge, sitting by designation*:

Defendant Luis Valentine appeals from the district court's denial of his motion to suppress evidence obtained from his car and his residence. Valentine contends that the district court erred in concluding that (1) his arrest and the subsequent search of his car were legal and (2) his wife's consent to search their apartment was voluntary and that the firearms found during the search should not be suppressed.[1]

## I. BACKGROUND

### A.  The Controlled Delivery

On Friday, October 8, 2004, members of a drug enforcement task force based at John F. Kennedy Airport in New York learned that boxes containing a sofa and loveseat had arrived from Puerto Rico, and that approximately 50 kilograms of cocaine were hidden inside the furniture. The boxes were shipped via FedEx and addressed to Luis Lebron, basement apartment of 377 Vernon Avenue, Brooklyn, New York. The task force officers, consisting of NYPD officers and DEA agents, intercepted the shipment and planned a controlled delivery for the following Monday.

---

[1]  Valentine also challenges a four-level enhancement applied to his criminal offense level. Because we remand to the district court for further proceedings relating to the evidence supporting his conviction, we do not consider this challenge at this time.

Because there were no FedEx trucks available for the controlled delivery that Monday, DEA Special Agent Christopher Banzer and NYPD Detective Rodney Perez dressed in FedEx uniforms, rented a delivery van and put magnetic FedEx signs on its sides. Another group of agents and police officers parked an undercover surveillance van across the street from 377 Vernon, where they recorded video of the location and received audio transmissions from a wireless device worn by Det. Perez. Other officers[2] were positioned in various locations within a few blocks of 377 Vernon.

As the officers pulled up in the delivery van at approximately 11:47 a.m., they saw Valentine getting out of a sedan parked near the building. Valentine walked toward the building and said something that Special Agent Banzer interpreted as "Paolo, FedEx, FedEx,"[3] and waved to a man named Pedro Rodriguez further down the street. Det. Perez asked Valentine if he could help unload the heavy boxes and Valentine agreed so long as Det. Perez paid him. Rodriguez then approached the officers and Valentine and the group discussed who would sign for the delivery. Valentine then went inside 377 Vernon and came out with a man identified only as "Angel." Angel said he would call Lebron to ask him to come home to sign for the delivery. Angel called Lebron and gave the phone to Det. Perez. The person on the phone purporting to be Lebron stated that he was at work and could not leave, but they should leave the delivery on the sidewalk for him. Valentine was not present for the phone call. Ultimately, no one signed for the boxes and Det. Perez and Special Agent Banzer went back to their office at JFK without making the delivery.[4]

---

[2] We collectively refer to the task force members as "officers."

[3] Valentine contends, and the district court concedes, that he may have actually said "Viejo," which means "old man" in Spanish, instead of "Paolo."

[4] No one was ever indicted for the 50 kilograms of cocaine contained in the furniture.

After the delivery van left, several of the officers continued surveilling 377 Vernon. Special Agent Robert Yoos, a 20-year veteran of the DEA, watched the apartment building from an unmarked police car. NYPD Detective Michael Johnson, with seven years' experience with the police department, continued surveillance from a van across the street. The officers observed Valentine going in and out of 377 Vernon and talking with various individuals on the sidewalk.

At approximately 1:00 p.m., Valentine, dressed in a gray hooded sweatshirt, came out of 377 Vernon and gestured to other people standing nearby and proceeded to walk up the block. Special Agent Yoos and Det. Johnson observed Valentine and the other people enter a vacant lot. None of the officers could see what transpired in the lot.[5] A few minutes later, Valentine reappeared alone at the other end of the block, holding a cup of coffee or some other beverage. Valentine walked back to 377 Vernon and later removed his sweatshirt and placed it in his car.

A supervising agent, who was not on the scene, authorized Valentine's arrest based on information furnished to him by Special Agent Yoos and Det. Johnson. Yoos then told NYPD Sergeant Allan Hoehl and NYPD Detective Paul Crockett to move in and arrest Valentine, while Special Agent Yoos walked up the street to arrest the other people loitering on the block who had entered the vacant lot with Valentine.[6]

B.      Valentine's Arrest

Valentine had stepped out of his car and was walking toward the trunk area at approximately 1:30 p.m. when Sergeant Hoehl and Det. Crockett blocked his car with their unmarked police cars. The officers, wearing plainclothes and badges, approached Valentine

---

[5] Although Det. Johnson testified that he could see Valentine and the others the entire time they were in the lot, the district court found that Det. Johnson could not see what transpired there.

[6] Of the five people arrested that day, only Valentine ultimately was prosecuted.

4

from the front and rear of his car and told him they were police officers and that he was under arrest. Valentine struggled with the officers, and Det. Johnson and at least two other officers ran over to assist in Valentine's arrest. Sergeant Hoehl stated that because he felt Valentine reach for his gun at one point during the scuffle, Sergeant Hoehl hit him on the head with handcuffs to subdue him. Once the officers had Valentine handcuffed, they called an ambulance to treat Valentine's resulting head wound.

After Valentine's arrest, Det. Johnson searched Valentine's car and found the gray sweatshirt Valentine had been wearing earlier in the day. Inside a pocket of the sweatshirt, he found some glassine bags of heroin. No other contraband was found in the car.

C.     The Search of Valentine's Apartment

Special Agent Yoos, parked up the street a few blocks, arrived at 377 Vernon shortly after Valentine's arrest. Special Agent Yoos then called for Sergeant Hoehl and Det. Crockett to accompany him to Valentine's apartment. When they knocked on the door, Valentine's wife, Annette Pena Morales, answered. She appeared as though she had just awakened and looked nervous, concerned, but also calm. Special Agent Yoos told Morales that he and the other officers were working on a narcotics case and that they had just arrested Valentine. Morales told the officers that she lived there with Valentine and their two children. She stated that she had been looking out the window and had witnessed Valentine's arrest.

Special Agent Yoos then asked Morales if they could come inside to discuss the matter further. Morales allowed the officers to enter the apartment. Special Agent Yoos informed her that her husband had just been arrested for a very serious narcotics offense. He then asked Morales if other people had been in the apartment earlier that day, and Morales said that her daughter and her daughter's boyfriend had visited. Special Agent Yoos asked if other people were currently in the apartment, and Morales said no.

5

As to what next transpired, Morales's testimony varies significantly from that of the officers.[7] According to the officers, Special Agent Yoos asked Morales if any guns or drugs were in her apartment and she denied that such items were present. She said that she had been asleep until a few moments before Valentine was arrested. Special Agent Yoos then asked her if they could search the apartment. Morales agreed, and Special Agent Yoos gave Morales a consent to search form. He read the form to Morales and told her that it allowed the officers to search her apartment. The consent form provides:

1. I have been asked to permit special agents of the Drug Enforcement Administration to search 377 Vernon Avenue, Brooklyn, N.Y., apartment 2.

2. I have not been threatened or forced in any way.

3. I freely consent to the search.

Morales signed the form.

Morales initially denied that there was any contraband in the apartment as the officers began to search.[8] Special Agent Yoos warned her that if they found a gun that she had not told them about, she would be in trouble. Eventually, she told the officers that there was a gun in a

---

[7] According to Morales, she gave consent for the officers to search the home, but only to look for people, not contraband. She stated that the officers had asked if they could take a look inside her apartment because they had seen two men come out of the apartment earlier in the day. She gave the officers permission to look around for the two men they mentioned, but she denies that she gave them permission to search for anything else.

In addition, Morales stated that the officers did not present the consent to search form to her until after they had discovered the guns in the bedroom. She said that the officers told her that if she did not sign it, everything they found would be attributable to her, and if she was charged with anything, she would probably lose her children. She stated that she signed the form because they had already searched the apartment and she did not think she was able to make them leave. After searching her apartment for approximately six hours, the officers instructed her to get dressed and then they arrested her. The district court did not credit Morales's testimony to the extent it conflicted with the testimony of the officers. *See infra* p. 9.

[8] After the officers' initial entry, two additional officers came to the apartment to assist in the search.

corner closet and two guns in a locked box. Det. Crockett discovered a shotgun inside a drawstring bag hanging on a door in the bedroom. In the upper corner of the bedroom closet, Det. Crockett found a locked fireproof box. After he found the key and unlocked it, he discovered two pistols inside the box. Morales told the officers that the guns belonged to Valentine. Det. Crockett also found a few glassine bags of heroin in a bedside table drawer. The officers then arrested Morales.

When the officers later questioned Valentine at their office, he told them that Morales was not involved and that he took responsibility for the evidence seized in the apartment.

### D.   Indictment and Motion to Suppress

A grand jury charged Valentine with one count of being a felon in possession of a firearm and one count of possessing heroin with intent to distribute. Valentine filed a motion to suppress the evidence relied upon by the grand jury, arguing that law enforcement officers had arrested him without probable cause, that the warrantless searches of his car and his apartment were tainted by his unlawful arrest, and that his wife did not consent to the search of their apartment.

The district court held a suppression hearing on Valentine's motion on September 13 and 27, 2005. At the hearing, the government presented five witnesses: Special Agents Banzer and Yoos, Dets. Johnson and Crockett, and Sergeant Hoehl. Valentine presented Morales as his witness.

The district court denied Valentine's motion to suppress. Though the district court found that Valentine's actions during the attempted FedEx delivery were too ambiguous to provide probable cause for his arrest, the court found that Valentine's entry into the vacant lot with other individuals and reappearance with a beverage a few minutes later was sufficient to provide probable cause for the officers to arrest him. The court relied on the testimony of Det. Johnson and Special Agent Yoos that, in their experience, Valentine's actions were consistent with those

7

of a narcotics dealer. Specifically, Det. Johnson stated that selling drugs to a group of people simultaneously minimized the chances of getting caught, and Valentine's purchase of a beverage afterwards was the way drug dealers typically rid themselves of possibly marked "buy money" used by undercover agents. Special Agent Yoos stated that, in his experience, Valentine's actions were consistent with a drug sale. The court explained its finding of probable cause as follows:

> While the court agrees with the defense that, standing alone, defendant's conduct, up until the failed controlled delivery, was too ambiguous to give rise to probable cause for an arrest, the totality of the circumstances, including defendant's conduct after the delivery attempt, amply supports the court's conclusion that there was probable cause for defendant's arrest.

(A.361). The court then concluded that the search of Valentine's car was incident to his arrest and therefore lawful.

With respect to the search of Valentine's apartment, the court held that the government's witnesses were credible, and Morales's testimony was incredible to the extent that it differed from that of the officers. The court found that Morales consented to the search and signed the consent form before the search began. The court also found that Morales's consent was given freely and that she never objected to the officers' search.

Finally, the court found that Valentine's statements to the officers after his arrest were voluntary because Valentine waived his *Miranda* rights and did not claim that he was forced to provide statements to the officers.

E.     Valentine's Conditional Guilty Plea and Sentencing

On February 28, 2006, Valentine pleaded guilty to Count One of the indictment, namely being a felon in possession of a firearm, pursuant to a written plea agreement. Although the plea agreement contained a provision by which Valentine waived his right to appeal or otherwise challenge his conviction or sentence if the district court imposed a term of imprisonment of 120

8

months or less, the plea agreement permitted Valentine to appeal the denial of his motion to suppress physical evidence.

Thereafter, the district court sentenced Valentine to 120 months of imprisonment. Valentine now brings this appeal.

## II.  STANDARD OF REVIEW

"On an appeal from a ruling on a motion to suppress, we review a district court's findings of historical fact for clear error, but analyze *de novo* the ultimate determination of such legal issues as probable cause . . . ,"  *United States v. Smith,* 9 F.3d 1007, 1011 (2d Cir. 1993); *accord Ornelas v. United States*, 517 U.S. 690, 695 n.4 (1996), including whether the exception for a search incident to that arrest is applicable, *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004).

## III.  DISCUSSION

### A.  Valentine's Arrest Was Not Supported by Probable Cause

The officers arrested Valentine without a warrant.  Such an arrest must be supported by probable cause or else it violates the Fourth Amendment. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983).  Valentine argues on appeal that the district court incorrectly concluded that his arrest was supported by probable cause.  He further contends that the physical evidence subsequently found by the officers after his arrest – through the search of his car and apartment – were the fruits of that illegal arrest.  Thus, the first issue raised by his appeal is whether the facts as found by the district court were sufficient to establish probable cause to arrest Valentine.

"Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being

9

committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)); *Beck*, 379 U.S. at 91. While probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," mere suspicion is not enough. *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). In determining whether probable cause exists to arrest a suspect, "[t]he experience of a police officer is a factor to be considered . . . but the relevance of the suspect's conduct should be sufficiently articulable that its import can be understood by the average reasonably prudent person." *Fisher*, 702 F.2d at 378.

Based on evidence heard at the suppression hearing, the district court concluded that Valentine's actions prior to the failed controlled delivery did not establish probable cause to arrest him. The district court noted that Valentine merely talked to Rodriguez in front of the apartment, entered and exited both his car and the apartment building several times, called Rodriguez when the undercover officers arrived with the furniture for the controlled delivery, and told Det. Perez that he would help carry the furniture if compensated. Relying on *Fisher*, 702 F.2d at 377, where we held that probable cause to arrest was not present where the suspect emerged from a house in the vicinity of a house under observation by the officers, hesitated and then re-entered the house, the district court concluded that Valentine's conduct up to this point was too ambiguous to give rise to probable cause to arrest.

We agree that Valentine's conduct prior to the controlled delivery did not support probable cause. The undercover officers had never met Valentine before they arrived for the controlled delivery and had no information from which they could conclude that Valentine was involved in the sale of narcotics. And while they suspected that Lebron, the intended recipient of the delivery, was involved in narcotics trafficking, nothing Valentine had done gave them an articulable basis for concluding that Valentine was associated with Lebron. At most, a

10

reasonably prudent person could conclude that Valentine was familiar with other residents of the apartment building, but not that he was associated with Lebron or anyone else involved in criminal activity.

The district court went further, however, and concluded that Valentine's conduct *after* the failed controlled delivery, coupled with his actions prior to the controlled delivery, gave the officers probable cause to believe that he had sold narcotics to a group of unidentified males loitering near the apartment building. In particular, the district court relied on the fact that Valentine exited his apartment building after changing into a sweatshirt; that he gestured to the unidentified men standing outside his apartment building, conversed with them, and walked together with them into an adjacent vacant lot through a fence, where the officers could not see what took place; that he re-emerged a few minutes later from a different direction, carrying a beverage; and that he entered and exited his car. Based on this conduct and the officers' interpretation of it – that a dealer, in their experience, would "come down and do everybody at once because it was less chance of him getting caught by the police" and then purchase something to get rid of the money used by the buyers in case that money was marked – the district court found that probable cause existed to arrest Valentine for the sale of narcotics. With that conclusion, we respectfully disagree.

We have previously held that no probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity. In *United States v. Ceballos*, for example, police officers monitoring the residence of a suspected drug dealer observed Ceballos, who was not the target of the investigation at that time, drive up and park in front of the suspected drug dealer's home. 654 F.2d 177, 179 (2d Cir. 1981). Ceballos exited a car, glanced around in what an officer described as a "curious manner," and entered the residence empty-handed. *Id.* Five to ten minutes later, Ceballos emerged from the

11

residence carrying a small brown paper bag, again looked around, entered the car, and then drove away. *Id.* The officers followed Ceballos, pulled him over at a stop light, ordered him out of the car with guns drawn, and discovered that the paper bag contained narcotics. *Id.* at 180-81. This court concluded that the officers' seizure of Ceballos was a de facto arrest and that the totality of the circumstances did not establish probable cause. *Id.* at 181, 185. In particular, this court found that even though the officers, based on their experience, were suspicious that Ceballos had purchased narcotics, probable cause required something more than generalized suspicion before the officers could have arrested him. *Id.*

Like *Ceballos*, a reasonably prudent person, based on the information known by experienced officers, would not believe that Valentine had committed a crime. Lacking any information that Valentine was involved in selling narcotics, that he was associated with the intended recipient of the narcotics-packed furniture, or that the unidentified men with whom Valentine entered the vacant lot had sought to purchase narcotics, the officers concluded that Valentine had consummated a drug deal. This inference was based primarily on the fact that he called some unidentified men together, disappeared with them through a vacant lot, and re-emerged a few minutes later carrying a beverage. Such non-criminal conduct, without more, is too ambiguous to support probable cause. While the officers' experience may have led them to suspect Valentine's social interaction with the men and his decision to purchase a beverage as consistent with the actions of drug dealers, they never observed any transaction between Valentine and the men. Indeed, the record does not indicate that, prior to the arrest, the officers observed any evidence of narcotics trafficking at the apartment building, except for the shipment of furniture to another person in a different apartment in the building. Thus, Valentine's conduct could not have generated anything more than a generalized suspicion that he was involved in criminal conduct. Such suspicions do not create probable cause to arrest. *See, e.g., Wong Sun v.*

12

*United States*, 371 U.S. 471, 479 (1963) ("It is basic that an arrest . . . must stand upon firmer ground than mere suspicion."); *compare United States v. Ingrao*, 897 F.2d 860, 863-65 (7th Cir. 1990) (finding no probable cause where a suspect carried an opaque bag down a gangway previously used by a narcotics suspect, looked around while crossing the street, and then drove carefully away while frequently looking in his rearview mirror), *with United States v. Rosario*, 638 F.2d 460, 462 (2d Cir. 1980) (finding probable cause where officers observed a plastic bag containing a substance which looked like cocaine, which was furtively carried from house to car and exhibited to two men for inspection).

The officers' interpretation of Valentine's actions seems to have been largely informed by his presence at the surveilled apartment building and his familiarity with other men who knew the intended recipient of the FedEx delivery. "[I]n order to find probable cause based on association with persons engaging in criminal activity, some additional circumstances from which it is reasonable to infer participation in criminal enterprise must be shown." *Ingrao*, 897 F.2d at 864 (quotation marks omitted). Nothing in the record linked Valentine to Lebron's suspected narcotics activity or the FedEx delivery, and without more, his presence at the intended site of the controlled delivery – which was also his residence – cannot support probable cause. It is for these reasons that we disagree with the conclusion of the district court and find that the cumulative record is insufficient as a matter of law to "warrant a man of reasonable caution in the belief" that Valentine committed a crime. *Carroll v. United States*, 267 U.S. 132, 162 (1925).[9]

---

[9] Although we hold that the facts as found by the district court did not give rise to probable cause to arrest Valentine, we recognize that Valentine's conduct may have given the officers some grounds for suspicion. We express no view, however, as to whether such suspicion was sufficient to stop Valentine under *Terry v. Ohio*, 392 U.S. 1 (1968), because the record indisputably reveals that the officers arrested Valentine and made no attempt to stop him for questioning. As the district court's findings reveal, two officers, acting under a superior's instructions, approached Valentine, told him that he was under arrest, and ordered him to put his hands behind his back. Based on "the degree of intrusion, the amount of force used, and the

13

Given that Valentine's arrest was not supported by probable cause, we also cannot agree with the district court's conclusion that the warrantless search of Valentine's car, wherein the narcotics were found, was a valid search incident to arrest under *New York v. Belton*, 453 U.S. 454, 460 (1981) (holding that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile"). While police officers may conduct a warrantless search of an individual's personal property if the search is incident to a lawful custodial arrest, officers lacking probable cause to arrest a suspect necessarily lack probable cause to conduct a search incident to that arrest. *See id.; United States v. Perea,* 986 F.2d 633, 642-43 (2d Cir. 1993). Given that the search of Valentine's car stemmed from an illegal arrest and the government has not presented any alternative grounds that would support a finding that the officers had probable cause to conduct a warrantless search of Valentine's vehicle, the evidence seized from that search must necessarily be suppressed as the fruit of the poisonous tree. *See Ingrao*, 897 F.2d at 866.

This does not end the necessary inquiry. Valentine was convicted, not for the possession of narcotics found in the search of his sedan, but for the firearms found in his apartment. The record indicates that the illegal arrest and search of the car prompted the officers to search Valentine's apartment with Morales's consent and to ultimately discover the firearms. However, under *Brown v. Illinois*, 422 U.S. 590 (1975) and its progeny, unless Morales's consent to search the apartment "had become so attenuated as to dissipate the taint" from the illegal acts leading up to that search, the firearms found inside the apartment must also be suppressed as the fruit of the

extent to which appellant's freedom of movement was curtailed," *Ceballos*, 654 F.2 at 183, nothing about the officers' conduct indicates that this was a *Terry* stop. Therefore, to the extent that the government argues that the officers only required reasonable suspicion of Valentine's criminal activity to stop him, we reject that argument as unsupported by the record.

poisonous tree. *Id.* at 599 (quotation marks omitted). Because the district court found that Valentine's arrest was lawful, it never considered the question of attenuation. We therefore remand for the district court to consider that question.[10]

## IV. CONCLUSION

For the foregoing reasons, the district court's denial of Valentine's motion to suppress is hereby vacated and remanded with instructions to conduct further proceedings consistent with this opinion. Any further appeal from the ruling of the district court, pursuant to this remand, shall be referred to this panel of judges.

---

[10] On remand, the district court should, if necessary, conduct additional fact finding to further develop the record on this issue.