06-3730-cr
U.S.A. v. Lopez

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: January 15, 2008                    Decided: November 10, 2008)

Docket No. 06-3730-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

    *Appellee*,

    -v.-

RICARDO LOPEZ,

    *Defendant-Appellant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: KEARSE, LEVAL, and CABRANES, *Circuit Judges*.

Defendant appeals from the judgment of the United States District Court for the Southern District of New York convicting him of possession of cocaine with intent to distribute, and possession of two firearms in furtherance of a drug trafficking crime. Defendant contends that the district court made two errors: first, in upholding the warrantless search of his car as an inventory search when (a) it was not governed in all aspects by a standardized police department policy and (b) the officer conducting the search did not make a complete inventory list; and second, in admitting expert testimony by a narcotics detective that cocaine and cutting materials found in defendant's car were evidence of distribution. The court of appeals (Leval, *J.*) affirms.

1

BRENDAN R. MCGUIRE, Assistant United States Attorney, Southern District of New York (Diane Gujarati, Assistant United States Attorney, *of counsel*; Michael J. Garcia, United States Attorney, *on the brief*), New York, NY, for *Appellee*.

COLLEEN P. CASSIDY, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, for *Defendant-Appellant*.

LEVAL, *Circuit Judge*:

Defendant Ricardo Lopez appeals from the judgment of the United States District Court for the Southern District of New York (Sidney Stein, *J.*) convicting him at a bench trial of possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 812, 841(a)(1) and (b)(1)(C), and possession of two firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). The court sentenced Lopez to ten months of imprisonment on the cocaine count, plus a mandatory consecutive term of sixty months on the firearm count, as well as three years of supervised release and a $200 special assessment. Defendant contends that the district court made two errors: first, in finding that the warrantless search of Lopez's car was justifiable as an inventory search, notwithstanding that the procedure for the search was not governed in all aspects by a standardized police department policy and the officer conducting the search did not make a complete list of the car's contents; and second, in admitting expert testimony by a narcotics detective that cocaine and cutting materials found in Lopez's car suggested distribution.

We affirm.

## Background

**I.     The Evidence at Trial**

The evidence presented at Lopez's trial, seen in the light most favorable to the government, *see United States v. Rommy*, 506 F.3d 108, 128 (2d Cir. 2007), showed the following.

*a.     Lopez's Arrest*

On August 3, 2005, at approximately 3:30 a.m., Police Officer Lorrie Arroyo and Sergeant Stacy Barrett of the New York City Police Department ("NYPD") were patrolling in a police vehicle in the Hunts Point neighborhood of the Bronx, watching out for prostitution and auto theft. They observed a car parked on the right side of Faile Street. Two people were in the car, with the passenger door open and the engine running. The officers slowed as they passed the car and overheard the occupants arguing. They parked their car and got out to investigate. Arroyo approached the driver's side of the car; Barrett the passenger's side. The driver, the defendant Lopez, told them he had been arguing with his girlfriend. The passenger identified herself as Griselle Lopez. (Ricardo Lopez and Griselle are neither married to each other nor otherwise related.) Griselle told the police she was just hanging out with her boyfriend. Arroyo smelled alcohol and noticed that the defendant's eyes were bloodshot and his speech was slurred. She asked him if he had been drinking, and he responded, "Yes, one cup." Arroyo decided to arrest him for driving while intoxicated. She asked him to step out of the car and frisked him. She found a bulge in his rear right pants pocket, which seemed heavier than a wallet. Arroyo asked him what was in his pocket. He replied that it was a gun. Officer Arroyo then reached into the defendant's pocket, recovered a handgun and a wallet, and alerted Barrett that the defendant had a gun.

Meanwhile, Sgt. Barrett had asked Griselle to get out of the car. The sergeant asked for her identification. She replied that it was in the car. Two other officers who had arrived on the scene stood with Griselle while Barrett went to get Griselle's bag from the car. Sgt. Barrett located a bag near the front passenger seat and asked Griselle if it was hers, and if so, whether the sergeant could look in it for a driver's license or some other form of identification. Griselle confirmed that it was her bag and gave the sergeant permission to search it for identification. Barrett observed a wallet in the bag. On removing it, she saw a clear glass container of white powdery substance, which she believed to be cocaine. Barrett then arrested Griselle.

The defendant and Ms. Lopez were taken to the 41st Precinct station house in separate police cars. Officer Fischer, one of the other officers who had arrived on the scene, took over the defendant's car and drove it to the station.

b.      *The Searches of Lopez's Car*

At the 41st Precinct, Officer Arroyo and Sgt. Barrett conducted an inventory search of the defendant's car. According to Arroyo's testimony, inventory searches are standard in the NYPD when a car is seized upon the arrest of an intoxicated driver, both to protect the property of the owner and to protect the police. "[Y]ou have to do a total inventory search of the vehicle," she testified. "Everything has to come out." In searching the car, Arroyo found two glassines of cocaine in the middle console between the two front seats, as well as a bottle of liquor in the driver's side door. From the trunk, the officers removed plastic bags, canvas bags, a beach chair and umbrella, and some audio speakers. Arroyo then found a small green toiletry bag "tucked away" on the driver's side of the trunk. In it she discovered thirteen glassines of cocaine, as well as cocaine-related paraphernalia:

a scale, a strainer with cocaine residue, a wooden masher with cocaine residue, two spoons with cocaine residue, more than one hundred empty glassines, and a jar of a white powdery substance that looked like cocaine. The officers then locked the gun, the bottle of liquor, the two glassines from the front middle console, and the green bag with its contents in a desk in their office. They drove the defendant to the 45th Precinct - which was, according to Officer Arroyo, an area hub for alcohol screening - where he was given a breathalyzer test and found to be legally impaired. At approximately 8:00 a.m., he was brought back to the 41st Precinct and returned to his cell. Shortly thereafter, Sgt. Barrett's shift ended and she went home.

Upon returning to the 41st Precinct, Arroyo noticed that Griselle was wearing jewelry. Arroyo asked her if someone could pick up the jewelry for her. Griselle arranged to have her daughter come to the station to get it. The daughter agreed also to take the defendant's belongings. Arroyo asked another officer, Officer Rivera, to make a list of the jewelry and have the daughter sign for it when the jewelry was handed over to her. Arroyo then went back to Lopez's car and began to place the contents into large plastic bags to give to Griselle's daughter. In the process of emptying the car, Arroyo looked in the glove compartment, where she found a loaded .38 caliber gun. Barrett testified that she had opened the glove compartment during the first search of the car, but became distracted when Arroyo asked her for a flashlight and failed to search it. Arroyo returned to the 41st Precinct to voucher the newly discovered gun and then turned over the noncontraband property to Griselle's daughter.

The list created by the officers identified items such as Griselle's pocketbook and jewelry. The beach chair, the umbrella, the audio speakers, etc. – items which Arroyo considered to be of no

5

substantial value – were covered by a general catch-all description: "the belongings from the vehicle." Officer Arroyo explained that it was her practice to itemize objects in an inventory list only when they are "worth something." "If I handed off something smaller, say like car items, antifreeze, I wouldn't make a list, because it is worth nothing." Sgt. Barrett testified that it was her practice to make a complete list of returned property to be signed by the recipient. Sgt. Barrett testified that a written inventory of seized items - including "noncontraband evidence" - is supposed to be made as part of an inventory search. However, Sgt. Barrett also testified that the absence of a list of "noncontraband property" was not a violation of police regulations.

c.     *Lopez's Post-Arrest Statements*

On the day of the arrest at approximately 5 p.m., after receiving *Miranda* warnings, the defendant made a statement and recounted orally that he bought one of the guns from a "crackhead"; that he found the other one near a nightclub in Manhattan; and that he had the gun that was found on him because "he was selling drugs and he had a beef with some individuals." He agreed to provide a written statement, in which he provided similar information about the guns and stated that he carried the gun found in his pocket for "self-protection." He also acknowledged in writing that the drugs found in the trunk of the car belonged to him. He said that he did not want to include in the written statement his earlier oral representation that he had a gun "because he was selling drugs and had a beef with some individuals."

d.     *Expert Evidence*

The government called two expert witnesses. Eloisa Dela Isla, a criminalist in the NYPD police lab who tested the drug-related evidence seized from the car, testified that the glassines and

the drug paraphernalia all tested positive for the presence of cocaine. Billy Ralat, an investigator at the United States Attorney's Office, testified about the practices of drug users and dealers, and about how drug-related paraphernalia found in Lopez's trunk are used to prepare and package glassines of cocaine for sale.

## II. District Court Proceedings

Prior to trial, Lopez waived his right to a jury trial and moved to suppress the drugs, drug paraphernalia, and gun recovered from the car, as well as his post-arrest statements. The motion to suppress the evidence found in the search of the automobile was on the ground that the warrantless search could not be justified as an inventory search because the officers did not prepare an inventory list of the items found and did not adhere to any prescribed standard procedure for the conduct of inventory searches. The motion to suppress his statements was on the ground that the delay in arraigning him before a magistrate judge was unreasonable.

The court conducted a combined bench trial and evidentiary hearing on the suppression motions. After the trial-hearing, the court denied both motions. As for the delay between Lopez's arrest and arraignment, the court found that it was reasonable in routine arrest processing. (This ruling is not challenged on appeal.) The court found that the inventory searches were reasonable because Officer Arroyo and Sgt. Barrett searched the car systematically, acted in good faith, and understood the proper purposes of an inventory search. With respect to whether the officers followed a standardized procedure, the district court observed that although "[n]o written rules or regulations were introduced into evidence at the trial . . . both officers, Arroyo and Barrett, testified that such procedures did exist." Noting the two officers' slightly different views, the court expressed

doubt whether the dictates of Department procedure as to how seized property should be listed had been "rigorously followed." In the absence of any evidence of bad faith on the part of the police, the court concluded that minor deviations from any required listing procedures would not invalidate an inventory search.

The court then found Lopez guilty on both counts.

## Discussion

**I.      The Inventory Search**

Lopez's first argument on appeal is that the district court erred in denying his motion to suppress the items seized from the car. Lopez contends that the warrantless search violated the standards of the Fourth Amendment because the government failed to establish that it was a valid *inventory* search. According to the defendant's arguments, the search could not qualify as an *inventory* search because its conduct was not dictated by a standardized policy and because the police did not create a complete inventory list of the objects found. We believe the defendant's arguments are based on a misunderstanding of Supreme Court precedent.

It is well recognized in Supreme Court precedent that, when law enforcement officials take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct. *See Illinois v. Lafayette*, 462 U.S. 640, 643 (1983) ("[An] inventory search constitutes a well-defined exception to the warrant requirement" under the Fourth Amendment (citing *South Dakota v. Opperman*, 428 U.S. 364 (1976))). This is because "[t]he policies behind the warrant requirement are not implicated in an inventory search, nor

8

is the related concept of probable cause." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (internal citation omitted). Such a search is not done to detect crime or to serve criminal prosecutions. It is done for quite different reasons: (1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger. *Opperman*, 428 U.S. at 369; *see also Bertine*, 479 U.S. at 372. The service of these objectives is wholly independent of whether the contents of the car figure in any way in a criminal investigation or prosecution.

The Supreme Court has, however, recognized the danger to privacy interests protected by the Fourth Amendment if officers were at liberty in their discretion to conduct warrantless investigative searches when they suspected criminal activity, which searches they would subsequently justify by labeling them as "inventory searches." *See Florida v. Wells*, 495 U.S. 1, 4 (1990). Accordingly, the Court has stressed the importance, in determining the lawfulness of an inventory search, that it be conducted under "standardized procedures." *See Bertine*, 479 U.S. at 374 & n.6; *Lafayette*, 462 U.S. at 648; *Opperman*, 428 U.S. at 374-75. In *Bertine*, the Court upheld the lawfulness of the inventory search, concluding that, "as in *Lafayette*, reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." 479 U.S. at 374. Our court has noted that a consideration in determining the reasonableness of an inventory search is whether the officials conducting the search "act[ed] in good faith pursuant to 'standardized criteria . . . or established routine.'" *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (quoting *Wells*, 495 U.S. at 4).

9

Lopez contends that the search of his car in this case failed to conform to these requirements. According to his argument, the testimony of Officer Arroyo and Sgt. Barrett showed that there is no standardized procedure in the New York City Police Department. Barrrett testified that it was proper procedure to list all items found in an impounded vehicle. Officer Arroyo said it was her practice to list only items of value, grouping others under a general catch-all. Arroyo added, "Some cops don't make any list at all, some cops may list everything. It is not written anywhere that we have to make any type of a list." Because the search conducted in his case under Officer Arroyo's direction did not result in a complete list of the contents of the car, Lopez argues further that the search necessarily failed to meet the requirement that the objective of the search must be to produce an inventory.

In our view, the argument misunderstands the Supreme Court's requirements. It is true, without doubt, that the Court has stressed the need for a standardized policy. The Court has made it clear that a standardized policy is required so that inventory searches do not become "a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4. The evidence adduced at the trial satisfied this standard. The unchallenged testimony of both Officer Arroyo and Sgt. Barrett established that there is a uniform standardized policy in the New York City Police Department to do a complete inventory search of the contents when a car is impounded. Arroyo testified, "[Y]ou have to do a total inventory of the vehicle. Everything has to come out." Sgt. Barrett confirmed that it is the responsibility of the officer to conduct an inventory search of an impounded car in order "to see if there were any items that needed to be safeguarded." This evidence was unchallenged and was credited by the district court. Accordingly, the purposes of the

Supreme Court's requirement of a standardized policy were satisfied.

The lack of standardization that serves as the basis of Lopez's argument concerns whether the inventory list produced must include an itemization of every object found in the car, or whether items of small value may be omitted or grouped under a general category. We do not understand the Supreme Court's requirement of a standardized policy to extend to this issue because it has no bearing on the reason for the requirement of standardization. A standardized policy is needed to ensure that inventory searches do not become "a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4. While the Supreme Court referred to the need for a standardized policy, we do not think the Court meant that every detail of search procedure must be governed by a standardized policy. We doubt, for example, that the Court intended a requirement of standardized policy as to the order in which different parts of the car are searched, or whether officers performing the search need to report the results on a standardized form, or whether the search should be conducted by the officers responsible for the impoundment decision. A standardized policy governing those questions would do nothing to safeguard the interests protected by the Fourth Amendment. Nor do we think the Court intended to require uniformity as to whether insignificant items of little or no value must be explicitly itemized. Once again, departmental uniformity on that issue would have no bearing on protecting the privacy interests of the public from unreasonable police intrusion. On the other hand, when a police department adopts a standardized policy governing the search of the contents of impounded vehicles, the owners and occupants of those vehicles are protected against the risk that officers will use selective discretion, searching only when they suspect criminal activity and then seeking to justify the searches as conducted for inventory purposes. As we understand the Supreme Court's objective, this is the kind of issue the Supreme Court had in mind

in requiring that an inventory search be governed by a standardized policy. The evidence offered by the government and accepted by the district court satisfied that requirement.

Nor do we find merit in Lopez's argument that the failure to itemize each object found in the car, instead of covering items of lesser value under a general catch-all category of "personal belongings," is incompatible with the Supreme Court's warning that "inventory searches should be designed to produce an inventory." *Wells*, 495 U.S. at 4. The search did produce an inventory. The concept of an inventory does not demand the separate itemization of every single object. A conventional family automobile is likely to contain a bunch of road maps, pens and a notepad, a bottle opener, packs of chewing gum or candy, clip-on sunshades, a pack of tissues, a vanilla-scented deodorizer, DVDs and children's games, a baby bottle and a soiled baby blanket, an old sock, a sweater, windshield cleaning fluid, jumper cables, a tow rope, a tire iron and jack, a first aid kit, and emergency flares, not to mention empty candy wrappers and wads of chewed gum. That an officer might use a catch-all to cover objects of little or no value in no way casts doubt on the officer's claim that the purpose of the search was to make an inventory. It would serve no useful purpose to require separate itemization of each object found, regardless of its value, as a precondition to accepting a search as an inventory search. Such an obligation would furthermore interfere severely with the enforcement of the criminal laws by requiring irrational, unjustified suppression of evidence of crime where officers, conducting a *bona fide* search of an impounded vehicle, found evidence of serious crime but, in making their inventory, failed to distinguish between the maps of Connecticut and New York, or failed to list separately the soiled baby blanket or a pack of gum. Imposing a requirement to identify each item separately, regardless of lack of value, would furthermore add considerable administrative burden without in any way advancing the purposes of the Fourth Amendment to

12

protect the public from "unreasonable searches and seizures." U.S. Const. amend. IV.

Finally, noting the Supreme Court's statement in *Bertine* that "reasonable police regulations relating to inventory searches administered in good faith satisfy the Fourth Amendment . . . ," 479 U.S. at 374, Lopez argues that in his case the procedures were not administered in good faith because the officers were motivated by the expectation of finding criminal evidence in his car. We believe this also misunderstands the Court's explanations. The Fourth Amendment does not permit police officers to disguise warrantless, investigative searches as inventory searches. *See id.* at 371-72. However, the Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search. When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes. *See Opperman,* 428 U.S. at 369; *see also Bertine*, 479 U.S. at 372. Under the Supreme Court's precedents, if a search of an impounded car for inventory purposes is conducted under standardized procedures, that search falls under the inventory exception to the warrant requirement of the Fourth Amendment, notwithstanding a police expectation that the search will reveal criminal evidence. If good faith is a prerequisite of an inventory search, the expectation and motivation to find criminal evidence do not constitute bad faith.

In the present case, while the officers may well have had an investigative motivation to search Lopez's car, the circumstances called for the impoundment of his car, as Lopez was arrested for driving it while intoxicated, and the impoundment required the conduct of an inventory search. We

13

find no reason to doubt that the Supreme Court's standards for the conduct of a warrantless inventory search were fully satisfied. We therefore affirm the district court's denial of the motion to suppress the evidence found in the impounded car.

**II.    The Expert Testimony**

Lopez's second argument on appeal is that the district court wrongly admitted the testimony of Billy Ralat, an investigator at the United States Attorney's Office, who testified that the drug paraphernalia seized from Lopez's car constituted evidence of distribution. We conclude that the district court's admission of the investigator's testimony was entirely proper.

We review for abuse of discretion a district court's decision to admit expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999). Expert testimony based on "scientific, technical, or other specialized knowledge" is admissible under the Federal Rules of Evidence, "in the form of an opinion or otherwise," so long as the witness is "qualified as an expert" and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Furthermore, otherwise admissible expert testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," unless the witness is testifying to the presence or absence of a "mental state" that is "an element of the crime charged or of a defense thereto." Fed. R. Evid. 704. This court has repeatedly found that the operations of narcotics dealers are a proper subject for expert testimony. *See, e.g., United States v. Simmons*, 923 F.2d 934, 946 (2d Cir. 1991).

Ralat testified to his qualifications at trial and in the voir dire. He had been a criminal investigator with the U.S. Attorney's Office for three years, following a twenty-year career as a

14

member of the NYPD, seventeen of which he spent investigating narcotics cases. At the end of his tenure with the NYPD, Ralat was one of about a hundred first-grade detectives. He stated that he was familiar with the practices of cocaine users and dealers, had made undercover purchases of narcotics, and had executed search warrants in apartments where drug distribution was taking place. Ralat had served as an expert witness in narcotics cases on seven prior occasions.

Over Lopez's objection, the district court granted the government's application to qualify Ralat as an expert in the practices of drug users and dealers, noting Ralat's extensive experience investigating narcotics with the NYPD, and stating that "his specialized knowledge would assist me to understand the evidence or determine a fact in issue." Ralat subsequently testified, *inter alia*, that the items found in Lopez's green bag constituted "basically a small distribution kit," explaining that "you have everything that you need to basically break [cocaine] down, cut it, and then rebag it for resale." He concluded that the items were more consistent with drug distribution than personal use. Ralat also said that street level dealers commonly carry guns to protect their drugs, their drug profits, and themselves from drug robbers.

Lopez contests the admission of Ralat's testimony on two grounds: (1) that it was not based on any reliable methodology or data, and (2) that it improperly provided a conclusion as to Lopez's intent in violation of Rule 704(b) of the Federal Rules of Evidence. Both arguments are without merit.

First, Rule 702 explicitly permits a witness to testify as an expert on the basis of "knowledge, skill, experience, training, or education." The district court qualified Ralat as an expert precisely on the basis of the "knowledge, skill, [and] experience" accumulated during his seventeen years as a NYPD detective investigating drug cases. Ralat then related important background information on

15

why a wooden masher, a metal strainer, two spoons, a scale, and more than one hundred empty glassines would be stored together and how they would be used as tools for a drug dealer. Ralat made it clear that his opinions were not only based on "what people tell me," but rather also on "what I have seen over years and years of being involved in investigating narcotics." A detective with nearly two decades' experience investigating drug crimes is well qualified to give such expert opinion. There was no error in qualifying Ralat as an expert under Rule 702.

Second, Ralat did not testify as to Lopez's intent. Rather, he merely stated that, based on his experience as a drug investigator, the drugs and paraphernalia found in Lopez's car were more consistent with distribution than personal use. The question – whether Lopez had the requisite intent to distribute – was clearly left to Judge Stein as the trier of fact. Thus, contrary to Lopez's argument, Ralat's testimony did not run afoul of Rule 704(b).

## Conclusion

The district court made no error in admitting evidence seized from the inventory search of Lopez's car, nor in admitting the contested expert testimony. We affirm the judgment of conviction.