*United States v. Bignon*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of May, two thousand twenty.

PRESENT:
> BARRINGTON D. PARKER,
> SUSAN L. CARNEY,
> > *Circuit Judges*,
> LEWIS A. KAPLAN,
> > *District Judge.*\*

————————————————————————

UNITED STATES OF AMERICA,

> *Appellee,*

> v.                                                                No. 19-2050

DAMON BIGNON,

> *Defendant-Appellant.*

————————————————————————

FOR APPELLANT:                          COLLEEN P. CASSIDY, Federal Defenders
                                        of New York, Inc., New York, NY.

———————————————

\* Judge Lewis A. Kaplan, of the United States District Court for the Southern District of New York, sitting by designation.

FOR APPELLEE:                                    BENJAMIN WOODSIDE SCHRIER (Sarah R. Krissoff, Anna M. Skotko, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Furman, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on July 2, 2019, is **AFFIRMED**.

Defendant-Appellant Damon Bignon appeals from a judgment of conviction entered on July 2, 2019, in the United States District Court for the Southern District of New York (Furman, *J.*). Bignon pleaded guilty to one count of possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g). On appeal, he challenges the District Court's denial of his motion to suppress evidence of a firearm that police officers discovered while searching his backpack at a police precinct following his arrest on a charge of smoking marijuana. We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to affirm.

In February 2019, the District Court held an evidentiary hearing on Bignon's motion to suppress. Based on evidence presented at that hearing, the District Court made the following findings of fact, which we must accept as true absent clear error. *See United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015).

On the afternoon of September 27, 2018, several officers from the New York City Police Department ("NYPD") were driving in a marked police van, conducting routine enforcement in the 44th Precinct, in the Bronx, New York. At about 2:50 pm, one of the officers, Kevin Seward, spotted Bignon smoking next to the wall of a building. Officer Seward suspected that Bignon was smoking marijuana because the smoke appeared thicker and whiter than tobacco smoke and because Bignon was holding the cigarette between his thumb and index finger. According to Seward, who had participated in more than two

hundred police encounters that resulted in either an arrest or an issuance of a summons for public smoking of marijuana, both the nature of the cigarette's smoke and the positioning of the cigarette were characteristic of someone smoking marijuana.

After Seward's colleagues in the van "confirmed" (in Seward's words) that Bignon appeared to be smoking "a joint" of marijuana, App'x 71, the officers stopped the vehicle and began to approach Bignon on foot. When Bignon and Officer Seward made eye contact, however, Bignon dropped his cigarette and started walking away from the officers. As Officer Seward tried to catch up with Bignon, he "smelled a slight odor of weed in the air," and, although the street was crowded, he did not observe any other person smoking in the vicinity. App'x 77-78 (internal quotation marks omitted).

Upon reaching Bignon, Officer Seward asked, "[W]here is it?" Bignon responded by stating, "It's just a joint," and then walking with Seward over to the discarded cigarette, which measured roughly a half-inch in length. *United States v. Bignon*, No. 18-CR-783 (JMF), 2019 WL 643177, at *2 (S.D.N.Y. Feb. 15, 2019) (internal quotation marks omitted). Officer Seward thought that, by using these words, Bignon was admitting to smoking marijuana because, in Seward's experience, individuals use the term "joint" to refer to cigarettes that contain marijuana. *Id.* One of Seward's colleagues then asked Bignon for his name and identification. When Bignon refused the request, the officers arrested him, despite his repeated protests that the cigarette contained "hemp," not marijuana. *Id.* (internal quotation marks omitted).

At the Precinct, Bignon told the officers his name and date of birth. After searching Bignon's person and finding photo identification (among other things), Seward and another officer, Zachary Lavender, escorted Bignon to the Precinct's cell area, explaining that they were going to write him a summons and then release him. The officers then took Bignon's backpack, which he had been carrying at the time of his arrest, and returned to the office area of the Precinct. There, they searched Bignon's backpack and discovered a black handgun and ammunition—the basis for Bignon's section 922(g) conviction.

Bignon moved to suppress the firearms evidence. He argued, first, that the officers lacked probable cause to arrest him and, second, that the officers' search of his backpack did not fall within the so-called "inventory-search exception" to the Fourth Amendment's warrant requirement. The District Court did not find either argument persuasive, and neither do we.

To execute a warrantless arrest without violating the Fourth Amendment, an arresting officer must have "probable cause to believe a crime has been or is being committed." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008). The officer, in other words, must possess "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Steppello*, 664 F.3d 359, 364 (2d Cir. 2011) (internal quotation marks omitted). We review *de novo* a district court's application of the probable-cause standard to its findings of fact. *See United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013). In doing so, we must evaluate "the totality of the circumstances" in light of "the training and experience of the arresting agents," recognizing that "some patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before." *Delossantos*, 536 F.3d at 159, 161 (alteration omitted).

Here, the District Court correctly concluded that probable cause existed to arrest Bignon for possession of marijuana in violation of New York Penal Law § 221.05. Giving "due weight" to Officer Seward's extensive history of enforcing New York's marijuana laws, *Delossantos*, 536 F.3d at 161, a reasonably prudent person could believe that Bignon was smoking marijuana based on the color and nature of the smoke, the distinctive way in which Bignon was holding the cigarette, the odor of marijuana in the air, and Bignon's reaction to the officers' approach (*i.e.*, discarding his cigarette and walking in the opposite direction), *see United States v. Jackson*, 652 F.2d 244, 251 n.6 (2d Cir. 1981) (explaining that "[p]robable cause can be established by a . . . suspicious smell"); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that "unprovoked flight upon noticing the police" can support the existence of probable cause). These specific and articulable observations create "more than a

4

generalized suspicion of [Bignon's] involvement in criminal activity," rising instead to the level of probable cause. *United States v. Valentine*, 539 F.3d 88, 94 (2d Cir. 2008).

It is true that police lab tests ultimately showed that Bignon's cigarette did not contain marijuana. That fact does not require us to unsettle the District Court's ruling, however, because probable cause may exist even when "a suspect is in fact innocent." *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003). "[T]he standard for probable cause is lower than that for conviction," we have explained. *Delossantos*, 536 F.3d at 161. Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Valentine*, 539 F.3d at 93 (internal quotation marks omitted). For similar reasons, the District Court's probable-cause finding is not undermined by the fact that Bignon repeatedly told the arresting officers that he was smoking hemp, not marijuana. Where, as here, the facts and circumstances of the arrest provide a reasonable basis for believing that probable cause existed, "an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley*, 460 F.3d 388, 395-96 (2d Cir. 2006). For these reasons, we affirm the District Court's determination that Seward had probable cause for the arrest.[1]

Bignon's challenge to the search of his backpack fares no better. Courts have long recognized an exception to the Fourth Amendment's warrant requirement for so-called "inventory search[es]"—*i.e.*, searches of an arrestee's "personal effects" that are conducted "as part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). Because "[t]he justification for such searches does not rest on probable cause," the Supreme Court has explained, "the absence of a warrant is immaterial to the reasonableness of the search." *Id.* Instead, inventory searches are justified by a range of governmental interests that includes (1) "protect[ing] the owner's property while it is in police custody"; (2) "protect[ing] the police

---

[1] In reaching our decision here, we do not—and need not—rely on the District Court's inference that marijuana and hemp produce similar odors when burned.

against spurious claims of lost or stolen property"; and (3) "protect[ing] the police from potential danger." *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008).

We are well aware of the Fourth Amendment concerns that would arise "if officers were at liberty in their discretion to conduct warrantless investigative searches when they suspected criminal activity, which searches they would subsequently justify by labeling them as 'inventory searches.'" *Id.* at 370. To counteract this potential danger, we have imposed two main limitations on the inventory-search exception. First, the search must be conducted "pursuant to standardized criteria or established routine," the existence of which "may be proven by reference to either written rules and regulations, or testimony regarding standard practices." *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (internal quotation marks, alterations, and citations omitted). Second, the officers must conduct the search "in good faith." *Id.* An inventory search, in other words, "must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

Here, we agree with the District Court that the officers searched Bignon's backpack pursuant to established routine. According Officer Seward's testimony, which the District Court credited, every arrestee brought to the 44th Precinct is placed in the station's cell area, even if the officers plan to release the arrestee in short order with a written summons. Officer Seward further represented that, whenever officers hold an arrestee in the cell area of the 44th Precinct, they "always search[ ]" the arrestee's personal belongings. App'x 91-92. Officers conduct these searches, Seward explained, to ensure "the safety of the people who are inside the precinct" and "to count [the arrestee's] property in case of any accusations later on of lost property." App'x 92. In light of this undisputed testimony, we conclude that Officers Seward and Lavender were not simply exercising their discretion when they searched Bignon's backpack, but rather were following the Precinct's "standard practice," which called for the search of the personal belongings of any arrestee who, like Bignon, was brought to the police station. *Bignon*, 2019 WL 643177, at *2 (internal quotation marks omitted).

Bignon does not directly attack this conclusion on appeal. Instead, he focuses on Officer Seward's practice of selectively *documenting* his inventory searches. As Seward

6

explained at the evidentiary hearing, he would "voucher[ ]" an arrestee's personal belongings if either (1) his search revealed criminal evidence or (2) he knew that the arrestee was going to be held in custody (*i.e.*, not released with a summons). App'x 158-59. If, however, his search of the arrestee's belongings did not yield any incriminating evidence and the arrestee was going to be released with a summons, Seward would "typically" return the property to the arrestee without "document[ing] it." App'x 153. In Bignon's view, this variation in written documentation conflicts with the standardization requirement of the inventory-search exception and renders the search unlawful.

Bignon's focus on documentation is misplaced, however, because the inventory-search exception is concerned principally with whether an officer *conducts* a search, not whether the officer *documents* that search. We made this point clear in *Lopez*. There, we noted that the police department did not have a standardized practice for documenting its inventory searches of impounded vehicles: we observed that some officers "list[ed] all items found in an impounded vehicle," others "list[ed] only items of value," and still others did not "make any list at all." *Lopez*, 547 F.3d at 370 (internal quotation marks omitted). We nevertheless concluded that the officers' search of the defendant's vehicle qualified as a valid inventory search, notwithstanding the department's "lack of standardization" in its documentation practices. *Id.* The Supreme Court did not intend for "every detail of [a] search procedure [to] be governed by a standardized policy," we explained. *Id.* at 371. Instead, the purpose of the standardization requirement is to safeguard "the privacy interests of the public from unreasonable police intrusion." *Id.* Those Fourth Amendment interests are at risk, we observed, when officers use their "selective discretion" to decide whether to search an arrestee's property. *Id.* They are not implicated, however, when officers exercise their discretion in documenting the results of an already-completed search. *See id.*

Here, the 44th Precinct's established practices constrain the type of police discretion that most concerned us and the Supreme Court, namely: the decision to search or not to search an arrestee's belongings. Far from being "at liberty in their discretion to conduct warrantless investigative searches when they suspect[ ] criminal activity," *id.* at 370, officers at the Precinct are expected to search the personal belongings of each and every arrestee

7

who comes through the station's doors.[2] Because we are directed to no evidence that Officers Seward and Lavender acted in bad faith when they searched Bignon's backpack pursuant to this standard practice, we conclude that their search qualifies as a valid inventory search.

* * *

We have considered Bignon's remaining arguments and conclude that they are without merit. Accordingly, the District Court's judgment is **AFFIRMED**.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court

---

[2] Seizing upon the Supreme Court's statement in *Wells* that "[t]he policy or practice governing inventory searches should be designed to produce an inventory," 495 U.S. at 4, Bignon contends that the production of a written inventory is "the *sine qua non* of an inventory search," Appellant's Br. 26. We disagree. As an initial matter, the officers did, in fact, produce an inventory of their search of Bignon's backpack. *See* Appellee's Br. Add. 1-11 ("Property Clerk Invoice"). In any event, *Wells* says nothing about the documentation of searches. The Supreme Court was concerned, instead, with whether a police officer could open closed containers found in an impounded vehicle when his department had "no policy whatever" regarding the searching of closed containers. *Wells*, 495 U.S. at 5-6. Moreover, "[a] range of governmental interests" justifies the inventory-search exception, not all of which would be furthered by the written documentation of a search. *Lafayette*, 462 U.S. at 646. For example, inventory searches protect police officers from dangerous items that may be hidden in an arrestee's personal belongings, and that protection would not be materially enhanced by the production of a written inventory. *Cf. Colorado v. Bertine*, 479 U.S. 367, 373 (1987) ("*Knowledge* of the precise nature of the property . . . help[s] to avert any danger to police or others that may have been posed by the property." (emphasis added)).