**UNITED STATES of America**

v.

**Juan ECHEVARRIA and Quirino Sanchez, Defendants.**

**No. 08 CR 868(LAP).**

United States District Court,
S.D. New York.

Feb. 22, 2010.

Telemachus Philip Kasulis, United States Attorney, New York, NY, for Plaintiff.

Glenn Andrew Garber, Glenn A. Garber, P.C., New York, NY, Anthony A. Capetola, Capetola & Doddato, Williston Park, NY, for Defendants.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, Chief Judge.

By motion dated January 16, 2009, defendant Juan Echevarria ("Echevarria") moved to suppress certain physical evidence, and by letter dated July 7, 2009, defendant Quirino Sanchez ("Sanchez") joined in the motion. On September 23, 2009, a hearing was held on the motions. Two New York City Police Department ("NYPD") Officers and a Virginia State Trooper testified for the Government: Officers Michelle Diaz and Steven Irizarry testified about the July 16, 2008 arrest of Echevarria and Sanchez, and Trooper Christopher Murphy testified about the February 10, 2009 arrest of Echevarria. The defendants did not testify although each defendant submitted an affidavit in support of his motion. The only defense witness was Cindy Guivas, a paralegal in Echevarria's lawyer's office, who testified regarding her experience in communicating in English and Spanish with Echevarria.

For the reasons set out below, the motions to suppress are denied.[1]

**A. The Government Case**

**1. The July 16, 2008 Arrests**

Officers Diaz and Irizarry, who have been NYPD officers for four and five

---

1. In reviewing defendants' submissions, I note that the defendants have shifted the focus of their argument for suppression of the marijuana found at the scene on July 16, 2008. In Echevarria's initial memorandum of law in support of his motion, Echevarria

years, respectively, were on routine patrol in the Bronx on July 16, 2008. According to the officers, at approximately 2:50 a.m., they responded to a 911 call reporting suspicious males unloading a commercial truck with a "Floral Beauty Express" logo on it, near 2548 Bailey Avenue, a dark and isolated area along the Major Deegan highway. (September 23, 2009 Hearing Transcript ("Tr.") 67, 69, 72, 121, 123–124.) Officers Diaz and Irizarry, who were in uniform, traveling in a marked police car driven by Officer Irizarry, arrived at 2548 Bailey Avenue several minutes after hearing the report of the 911 call. At the scene, they found a truck matching the description and in the location provided in the 911 call. The truck was parked facing southbound on Bailey Avenue. (Tr. 70, 123, 125.) Officers Diaz and Irizarry were the first to arrive at the scene; other police cars, both marked and unmarked, arrived at the scene shortly after Officers Diaz and Irizarry responded to the 911 call. (Tr. 70, 99, 123.)

After parking their police car near the front of the truck and leaving the headlights of their police car on, Officers Diaz and Irizarry got out of their car and began to conduct a sweep of the truck, Officer Diaz walking along the street-side of the truck and Officer Irizarry walking along the curb-side of the truck. (Tr. 74–75, 125–126.) As Officer Diaz walked toward the back of the truck, she observed Echevarria, who was standing near the back of the truck, throw an approximately three-foot long cardboard box to the ground. (Tr. 75–76.) At that time, other officers were approaching where Officer Diaz was at the back of the truck. (Tr. 100.)

After throwing the box, Echevarria began to walk "in a pretty fast manner" away from the truck, in the opposite direction from the direction the truck was facing. (Tr. 77, 126.) Officer Diaz followed Echevarria and told him to stop, after which she directed him, with her hand on his shoulder, to sit on the ground. (Tr. 77–78.)

Immediately thereafter, Officer Diaz took out her flashlight and shined it toward the cardboard box she had seen Echevarria throw on the ground. (Tr. 78.) Other officers, including Officer Irizarry, were looking at the box at the same time. (Tr. 80, 128.) Both Officer Irizarry and Officer Diaz observed that the box was partially open and, in the part of the box that was open, they saw what appeared to be marijuana contained in a clear plastic bag with a few flower stems on top of the plastic bag. (Tr. 80–81, 128–129.) Officer Irizarry also recognized the smell of marijuana coming from the box. (Tr. 128–129.) The box was then fully opened, and Officer Diaz saw several one-gallon plastic bags that appeared to contain marijuana. (Tr. 81.) Officers Diaz and Irizarry then proceeded to place Echevarria under arrest. (Tr. 82.)[2]

"challenge[d] the government's allegation that any marijuana was ever in plain view." (Echevarria's January 16, 2009 brief at 14.) Echevarria now focuses instead on the timing of his arrest and determining which of the boxes found at the scene contained which of the one-gallon bags of marijuana. (letter brief dated October 5, 2009 ("Br.") at 6–9.)

**2.** In his brief, Echevarria alleges that Officer Diaz handcuffed Echevarria at the time she directed him to sit on the ground. (Br. at 2.)

Officer Diaz did not testify that she placed Echevarria in handcuffs at the time she sat him on the ground; she testified credibly that she and her partner "proceeded to place Echevarria under arrest" after observing marijuana in the box that Echevarria had thrown. (Tr. 81.) Officer Irizarry, who was on the opposite side of the truck from Officer Diaz, and was walking northbound towards the end of the truck when Officer Diaz stopped Echevarria past the end of the truck, testified that he did not know specifically how Officer Diaz

Officer Irizarry next shined his flashlight in the trailer of the truck, which had one of its doors open, to see if anyone was inside the back of the truck. (Tr. 129.) Officer Irizarry then proceeded to the cabin of the truck, where he looked in the window and saw Sanchez, who appeared to be sleeping inside the truck. (Tr. 130.) Officer Irizarry went into the cabin of the truck and escorted Sanchez outside of the truck, after which he handcuffed Sanchez and conducted a quick "patdown search." (Tr. 82–83, 130, 160.) Officer Irizarry did not search the cabin of the truck. (Tr. 161.)

Officers Diaz and Irizarry then contacted their sergeant, who reported to the scene to verify the arrests. (Tr. 83, 131.) The defendants were subsequently transported to the NYPD's 52nd Precinct (the "Precinct"). (Tr. 82, 131.) No search of the trailer or the cabin of the truck was conducted prior to the defendants' being transported back to the Precinct. (Tr. 135.) Following the arrest, boxes in addition to the partially opened box that were outside the truck were placed in a police car and transported back to the Precinct at the same time the defendants were brought to the Precinct. (Tr. 82–83, 133.) [3]

Officers Diaz and Irizarry, who returned to the Precinct at around the same time the defendants arrived at the Precinct, next prepared paperwork to process the arrests, including beginning to inventory and voucher the contents of the boxes found at the scene. (Tr. 84, 131–133.) At approximately 8 a.m., Officers Diaz and Irizarry returned to the scene, at which point other law enforcement agents searched the trailer of the truck. (Tr. 87–88, 133.) Officers Diaz and Irizarry did not participate in that search, and no other boxes of marijuana were found during the search. (Tr. 88, 135.)

At approximately noon, Officers Diaz and Irizarry returned to the Precinct to continue to voucher the marijuana found at the scene at the time the defendants were arrested. (Tr. 134–135.) The boxes had been secured at the Precinct during the time Officers Diaz and Irizarry had returned to the scene. (Tr. 88.) Prior to completing the voucher process, Officer Diaz met with Alcohol, Tobacco, Firearms and Explosives ("ATF") Agent Michael Zeppieri and told him she had seen Echevarria at the back of the truck toss a box to the ground and that the box was open and showed a clear plastic bag of marijuana. (Tr. 111, 115.)

Officers Diaz and Irizarry found over 40 one-gallon clear plastic bags of marijuana in the boxes they vouchered. (Tr. 88, 136; GX–6.) Officers Diaz and Irizarry then transported the marijuana to the police laboratory in Queens and completed their shift for the day. (*Id.*)

## 2. The February 10, 2009 Arrest

Trooper Christopher Murphy, a Virginia State Trooper who has been a law enforcement officer for approximately thirteen years and is the lead instructor for the Virginia State Police on criminal interdiction, testified for the Government regarding Echevarria's February 10, 2009 arrest. (Tr. 19.) According to Trooper Murphy,

got Echevarria to sit down on the ground and that he did not know at what point Echevarria was handcuffed, although his recollection was that Echevarria was handcuffed before he was seated on the ground. (Tr. 77, 127, 147–149.)

3. In their reply, defendants raise certain questions about when the additional boxes containing marijuana were taken from the back of the truck, when they were inspected and the like. Because, as indicated below, the police were entitled to conduct an inventory search and thus discovery was inevitable, such details are not relevant.

at approximately 1:15 p.m. on February 10, 2009, while working on Interstate 95 in Greensville County, Virginia, he pulled over a commercial truck driven by Echevarria for traveling too closely behind another vehicle, in violation of Virginia Code Section 46.2–816, which requires that drivers maintain a "reasonable and prudent" distance behind other vehicles. (Tr. 25–26, 54.) Based on Trooper Murphy's training and experience, he testified that it would take approximately 300 feet for a commercial truck like the one Echevarria was driving to stop if it was going the speed limit of 65 miles per hour. (Tr. 26.) Trooper Murphy observed Echevarria's truck following approximately 15 feet behind another commercial vehicle that was hauling logs. (Tr. 25–26.) Trooper Murphy's attention was drawn to Echevarria's truck because the truck company, ANAM, was a company from which Trooper Murphy had made two previous seizures of contraband. (Tr. 26.) Trooper Murphy had spoken to an owner of the ANAM truck company, Oscar Alfonso, after the two previous seizures, who told Trooper Murphy that Mr. Alfonso "was very concerned about his drivers being involved in illegal activity" and that Trooper Murphy could "feel free to stop and search any ANAM truck that was owned or leased by ANAM." (Tr. 26–28.) However, Trooper Murphy did not believe he could pull over Echevarria's truck based on Mr. Alfonso's statements alone. (Tr. 27–28.)

When Trooper Murphy initiated the traffic stop, a video camera located near the rear view mirror in his police car was activated. (Tr. 31.) During the suppression hearing, the Government played the video recording (with audio), from the beginning of the video until the point that Echevarria provided oral consent to Trooper Murphy to search his truck. (Tr. 32–39; GX–1.) Based on what can be seen and heard in the video, and on Trooper Murphy's testimony, Trooper Murphy and

Echevarria engaged in a conversation in English for approximately fifteen minutes during which each appeared to understand what the other was saying based on both their words and their actions. At no time did Echevarria state that he did not understand what Trooper Murphy was saying. According to Trooper Murphy, he spoke to Echevarria in English because Echevarria responded to his questions in English and because he understood federal rules related to maintaining a commercial driver's license ("CDL") to require that CDL-holders be able to communicate effectively in English. (Tr. 34–35.)

At the beginning of the traffic stop, after Trooper Murphy signaled for Echevarria to remain in the truck for safety reasons, Trooper Murphy approached on the passenger side of the truck, and advised Echevarria, in English, of the traffic violation Echevarria had committed. (Tr. 33–34.) Echevarria acknowledged the violation verbally and by nodding his head. (Tr. 34.) Trooper Murphy reviewed Echevarria's documents, including his CDL and medical card, which Echevarria had given to Trooper Murphy in response to Trooper Murphy's verbal request. (Tr. 33.) Trooper Murphy told Echevarria that his medical card had expired and advised Echevarria that when they were finished with the traffic stop, Echevarria would not be able to drive until he updated his medical card. (Tr. 36.) Trooper Murphy then asked Echevarria to come back to Trooper Murphy's police car, which is a routine procedure for Virginia State Troopers, so that Trooper Murphy could review Echevarria's paperwork, including his log book, truck registration and insurance documents. (Tr. 37.) As they walked back to the police car, Echevarria and Trooper Murphy discussed, in English, a variety of topics including who Echevarria worked for, who owned the truck he was driving, his employment history, what kind of car-

go he and his co-driver were hauling, where they picked it up, where they were to deliver it, who loaded it in the truck, as well as Echevarria's relationship to and knowledge of his co-driver. (GX–1; Br. at 4.)

Trooper Murphy then spoke to Echevarria's co-driver briefly outside his police car and subsequently returned to the police car to speak further to Echevarria. (GX–1.) Trooper Murphy asked Echevarria if there was anything illegal in the truck and then specified the type of illegal items about which he was asking. (Tr. 38.) Trooper Murphy asked if there were any guns, to which Echevarria replied, "no." Trooper Murphy then advised Echevarria to tell him the truth, after which Echevarria repeated "no, no, no." Trooper Murphy next asked if there was marijuana; Echevarria said "no." Trooper Murphy asked about cocaine; Echevarria again said "no." When Trooper Murphy asked Echevarria if he was sure, Echevarria then said "I don't know." Trooper Murphy asked "What about him," referring to Echevarria's co-driver, and again Echevarria said "I don't know." Trooper Murphy then asked, "any money, mucho dinero?," to which Echevarria said "no, nothing, nothing." (GX–1; Tr. 38.)

Trooper Murphy asked Echevarria additional questions for a few more minutes and then told Echevarria to catch up his log book and advised Echevarria that neither he nor his co-driver could drive because Echevarria's medical card was expired and his co-driver had to sleep before driving again. (GX–1.) Trooper Murphy advised that they "shut down" for a period of time before continuing their trip. (*Id.*) Trooper Murphy next gave Echevarria

back his CDL, his medical card and the rest of his paperwork, told Echevarria that they were "finished," that Trooper Murphy was not going to write Echevarria any tickets and that Echevarria was "free to go at any time." (GX–1; Tr. 38–39.) During the next ten seconds, the following occurred: First, Trooper Murphy said he would like to search the truck to make sure there were "no guns or anything on the truck," after which Echevarria stated, "no, no, nothing." Next, Trooper Murphy asked, "can I search it," and Echevarria said, "Yeah." Finally, Trooper Murphy said, "ok, you can get up," and gestured to Echevarria to get up. (GX–1; Tr. 64.) After they were out of the car, Trooper Murphy asked Echevarria if Echevarria could go with Trooper Murphy to get the keys, to which Echevarria replied, "yeah," and proceeded to the front of the truck with Trooper Murphy to give Trooper Murphy the keys to the truck. (GX–1; Tr. 39.)

Trooper Murphy and other troopers then searched the truck, in which they found two brown cardboard boxes hidden inside a pallet of white boxes.[4] (Tr. 39.) The two boxes contained 26 one-gallon clear plastic bags of marijuana. (GX–2, GX–3; Tr. 43–44, 46.) Echevarria and his co-driver were subsequently arrested, transported to the Virginia Commonwealth Attorney's Office and interviewed by other law enforcement officers. Later that day they were charged with Virginia narcotics offenses. (Tr. 45.)

## B. The Defense Case

The defendants did not testify at the suppression hearing, but Echevarria and

---

4. Trooper Murphy had called for back up, and, prior to Echevarria's giving consent to search the truck, other officers arrived near the scene and were in a car parked approximately 50 feet behind Trooper Murphy's police car. (Tr. 63.) The other officers were not visible or audible on the video until after Trooper Murphy and Echevarria left the police car to get the keys to the truck.

Sanchez submitted factual affidavits in support of their motions. In both of his affidavits, Echevarria stated that he was in possession of the truck and the items therein that were searched and seized by the police. (January 15, 2009 Aff. ¶ 5 and August 14, 2009 Aff. ¶ 4.) Echevarria also called Cindy Guivas, a paralegal who works for his lawyer, Glenn Garber, who testified that she had spoken to Echevarria in Spanish on twenty to twenty-five occasions and that she had translated between Spanish and English for Mr. Garber when Mr. Garber had communicated with Echevarria. (Tr. 165.) Ms. Guivas also stated that Echevarria could understand English if spoken to slowly and with simple vocabulary but that he would not understand complex legal concepts. (Tr. 166.) Ms. Guivas is not certified as a translator and she was not present when Echevarria was arrested on July 16, 2008 or on February 10, 2009. (*Id.*)

### *Discussion*

With regard to the July 16, 2008 arrests of both defendants, I credit the testimony of Officers Diaz and Irizarry, including the facts regarding (i) the initial brief detention of Echevarria after he tossed a box and began to walk quickly away in a deserted area of the Bronx in the middle of the night, (ii) the officers' observance of marijuana in plain view in a partially opened cardboard box, and (iii) the subsequent arrests of Echevarria and Sanchez. In addition, Officer Diaz testified credibly that she saw more than one box being put in another police car after the defendants were in custody. (Tr. 82.) Officer Irizarry further testified credibly that "everything that was at the scene outside" was brought back to the Precinct to be inventoried. (Tr. 133.) The marijuana in the boxes found at the scene at the time of the arrests was secured in a room at the Precinct when Officers Irizarry and Diaz returned to the scene later that morning. When Officers Irizarry and Diaz returned to the Precinct, they properly vouchered that marijuana and the boxes and later brought the marijuana to the NYPD laboratory for testing. Accordingly, I find that there was nothing improper about the arrests of Echevarria and Sanchez and thus there is no basis to support suppression of the marijuana or the boxes recovered. Each NYPD officer's testimony was internally consistent and consistent in all material ways with the other officer. Any perceived minor differences between the witnesses' testimony—such as how much of the first box was opened-demonstrate that the officers did not coordinate their testimony. So, too, the officers' forthrightness about what they did not observe or recall—such as Officer Diaz's admission that she could not identify which of the boxes was the one she had seen partially open at the scene—demonstrates their honesty. Again, I credit their testimony as to the July 16, 2008 arrests.

With regard to the February 10, 2009 arrest, the Court had the benefit of a video of Trooper Murphy's stop and subsequent arrest of Echevarria. Trooper Murphy presented on the video as professional and courteous. Moreover, it is apparent from the approximately fifteen minutes of conversation between Echevarria and Trooper Murphy on the video that Echevarria can speak and understand English. Echevarria's consent to search the truck was given voluntarily after he was explicitly told he was free to leave. With regard to the traffic stop itself, which is not on the video, I credit Trooper Murphy's testimony in which he provided a credible justification for the stop, providing significant detail regarding how closely Echevarria's truck was following behind another commercial vehicle and citing the specific statute giving Trooper Murphy authority to make the stop.

### A. Burden of Proof

■ "On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." *United States v. Wyche*, 307 F.Supp.2d 453, 457 (E.D.N.Y.2004). *See also United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."); *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983); *United States v. Joseph*, 332 F.Supp.2d 571, 574 (S.D.N.Y.2004) ("[B]oth the Supreme Court and Second Circuit have held that there are situations where the burden of persuasion at a suppression hearing can shift to the Government to prove, by a preponderance of the evidence, that the proffered evidence is valid.") (citations omitted).

### B. The July 16, 2008 Arrests

#### 1. The Marijuana Seized From the Partially Opened Box Was In Plain View

■ The "plain view" exception to the warrant requirement requires that: (1) the agents have lawful access to the place from which the item can be plainly viewed; (2) the objects seized are in plain view at the time they are discovered; and (3) it is "immediately apparent" to law enforcement at the time of the discovery that the item constitutes evidence or fruit of a crime. *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). For an item's criminal nature to be "immediately apparent," a reasonable agent must conclude that there is "probable cause" to believe that the item constitutes evidence or fruit of a crime, without conducting some further search of the ob-

ject. *United States v. Grubczak*, 793 F.2d 458, 461 (2d Cir.1986); *United States v. Padilla*, 986 F.Supp. 163, 169 (S.D.N.Y. 1997) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). In making this determination, the court is to consider whether probable cause exists from the perspective of a law enforcement officer. *United States v. Moreno*, 897 F.2d 26, 33 (2d Cir.1990), *abrogated on other grounds as recognized by Ruggiero v. Krzeminski*, 928 F.2d 558 (2d Cir.1991).

■ Both Officer Irizarry and Officer Diaz testified credibly that the box they observed on the ground behind the truck was partially open, which makes sense because Echevarria had tossed the box on the ground as Officer Diaz approached. (Tr. 80–81, 128–129.) Officer Diaz testified that although it was dark, she was able to see Echevarria, aided in part by light coming from police car headlights. (Tr. 74, 76.) In the part of the box that was open, aided by the use of a flashlight, both officers saw what appeared to be marijuana contained in a clear plastic bag. (*Id.*) Officer Diaz also recognized the clear plastic bag as packaging she had seen in prior marijuana arrests, and Officer Irizarry recognized the smell of marijuana coming from the box. (Tr. 81, 128–129.) It was therefore immediately apparent to both officers, based on their training and experience, that what they were seeing was the illegal narcotic marijuana. *Grubczak*, 793 F.2d at 461.

#### 2. Law Enforcement Had Reasonable Suspicion To Conduct A Brief Investigative Detention Of Echevarria

■ It is well settled law that a police officer may conduct a brief "investigative detention" by stopping a person to investigate possibly criminal behavior, so long as at the time the officer effects the stop, the

officer has " 'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." *United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.1995) (*citing United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992)); *see also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion" arises when law enforcement officers are "aware of specific facts, together with rational inferences from those facts, that reasonably warrant suspicion." *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *see also United States v. Jaramillo,* 25 F.3d 1146, 1150–51 (2d Cir.1994) (law enforcement may conduct a *Terry* stop without infringing the Fourth Amendment so long as the circumstances "would warrant a man of reasonable caution in the belief that a brief investigative stop is appropriate") (internal quotation and citations omitted).

■■■ "Reasonable suspicion" is measured by an objective test, *Glover,* 957 F.2d at 1010, and by reviewing the circumstances as a whole, not as discrete and separate facts, *United States v. Barlin,* 686 F.2d 81, 86 (2d Cir.1982); *see also United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The test for reasonable suspicion is a "rather lenient" one, *United States v. Santana,* 485 F.2d 365, 368 (2d Cir.1973), which the Second Circuit has described as "not a difficult one to satisfy," *United States v. Oates,* 560 F.2d 45, 63 (2d Cir. 1977) *see United States v. Lawes,* 292 F.3d 123, 127 (2d Cir.2002) (reasonable suspicion "not a high threshold"). It requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *Tehrani,* 49 F.3d at 58; *accord Arvizu,* 534 U.S. at 274, 122 S.Ct. 744. Courts have repeatedly emphasized that reasonable suspicion is measured from the perspective of a trained and experienced law enforcement officer. *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d

621 (1981); *United States v. Forero–Rincon,* 626 F.2d 218, 221–22 (2d Cir.1980). The process "does not deal with hard certainties, but with probabilities" and properly takes into account that trained law enforcement agents may make observations and draw conclusions that go beyond the capacity of a lay person. *Cortez,* 449 U.S. at 418, 101 S.Ct. 690; *United States v. Villegas,* 928 F.2d 512, 517 (2d Cir.1991).

■■■ When evaluating the reasonableness of suspicion predicated on anonymous information such as 911 calls, courts must examine the totality of the circumstances. *See United States v. Bayless,* 201 F.3d 116, 133 (2d Cir.2000). The independent corroboration by police officers of "significant aspects of a tip's predictions" weighs heavily in the courts' analysis of the totality of the circumstances. *See United States v. Walker,* 7 F.3d 26, 31 (2d Cir.1993) (where police corroborated several aspects of an anonymous tip regarding a suspect carrying a firearm, including the suspect's physical appearance and predicted route of travel, there was reasonable suspicion to seize the suspect). In fact, it is settled law that anonymous tips of criminal activity accompanied by independent, corroborated observations of police officers may compel police to conduct a *Terry* stop. *See, e.g., United States v. Simmons,* 560 F.3d 98, 108 (2d Cir.2009) (where officers were responding to 911 report of assault in progress in a high-crime area late at night and encountered defendant walking with his hands in his pockets and he did not comply with first order of police to stop, totality of circumstances supported conclusion that officers had reasonable suspicion to stop defendant); *United States v. Bold,* 19 F.3d 99, 103 (2d Cir.1994) (police officers' independent corroboration of anonymous tip regarding the type of car reportedly containing a gun and the location

supported the reliability of the tip and a *Terry* stop).

 The totality of circumstances here, including the desolate location in the Bronx, the late hour, the fact that several details from the 911 call were immediately corroborated and that Echevarria threw a cardboard box behind the truck and then walked quickly away from the truck and Officer Diaz, who was wearing her NYPD uniform, are sufficient for Officer Diaz to have had a reasonable suspicion to believe that criminal activity had occurred or was about to occur.[5] *Simmons*, 560 F.3d at 108.

### 3. Officers Diaz and Irizarry Had Probable Cause To Arrest the Defendants

 Warrantless arrests such as the ones in this case are fully justified if there is "probable cause when the defendant is put under arrest to believe that an offense has been or is being committed." *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir.1987). Probable cause exists "if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the

person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990) (citing, *inter alia, Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), and *Illinois v. Gates*, 462 U.S. 213, 230–32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

 After seeing what appeared to be a large clear plastic bag full of marijuana in the partially opened box Echevarria had just tossed to the ground and then seeing several similar bags after the box had been opened, Officer Diaz proceeded to place Echevarria under arrest. (Tr. 81.) Officer Irizarry, having also seen the alleged marijuana, and recognizing it by its smell, subsequently placed Sanchez under arrest. (Tr. 82–83, 128–130, 160.) Both officers therefore had sufficient knowledge to justify a person of reasonable caution believing that Echevarria and Sanchez were engaged in marijuana distribution. *Patrick*, 899 F.2d at 171.

### 4. The Remaining Marijuana Is Not Suppressed Because It Was Seized And Searched Pursuant To A Lawful Inventory Search

 "[I]nventory searches of items lawfully obtained by the police fall within a well-defined exception to the Fourth

---

**5.** Echevarria argues, relying solely on the testimony of Officer Irizarry, who was several feet away at the time (Tr. 148), that if Officer Diaz handcuffed Echevarria immediately upon stopping him, the handcuffs themselves transformed the stop from a *Terry* stop to an arrest. (Br. at 6.) Even if I found the facts as Echevarria describes them, the brief use of handcuffs during a *Terry* stop does not elevate a *Terry* stop to an arrest, nor is an officer prohibited from using handcuffs when faced with a *Terry* stop subject who indicates a desire to leave, and attempts to do so, before the officer has completed the stop, especially when the stop is of short duration. *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004); *Kennedy v. McKiernan*, 04 CV 1367, 2009 WL 2514067, at *5 (D.Conn.2009).

Moreover, the cases cited by Echevarria are inapposite as they involve situations in which defendants were detained for long periods of time and/or removed to alternate locations to be questioned. For example, in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the Supreme Court found that even though the defendant was not officially arrested, the officer's behavior amounted to an arrest because the defendant was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room where he was questioned. Here, almost immediately after putting Echevarria on the ground, Officer Diaz saw the marijuana in plain view and then had probable cause to arrest Echevarria.

Amendment's warrant requirements." *United States v. Thompson,* 29 F.3d 62, 65 (2d Cir.1994). Furthermore, "[i]t is well recognized in Supreme Court precedent that, when law enforcement officials take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct." *United States v. Lopez,* 547 F.3d 364, 369 (2d Cir.2008) (collecting cases). Several rationales form the basis for the exception, including to protect the owner's property while it is in police custody, to insure against claims of lost, stolen or damaged property and to guard the police from danger. *Thompson,* 29 F.3d at 65; *see also United States v. Perea,* 986 F.2d 633, 644 (2d Cir.1993) ("arresting officers may 'impound the personal effects that are with [the arrestee] at the time to ensure the safety of those effects or remove nuisances from the area'"). To be lawful, the inventory search must be reasonable. *Lopez,* 547 F.3d at 370. The reasonableness of an inventory search is determined by whether the officials conducting the search "act[ed] in good faith pursuant to standardized criteria ... or established routine." *Id.* (quoting *Thompson,* 29 F.3d at 65) (internal quotes and citation omitted). *See also Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to "standardized criteria ... or established routine").

█ If an inventory search of a vehicle or other property is inevitable, a search of the property at the time of arrest is proper even if the vehicle or other property has not yet been taken into custody. *United States v. Perea,* 986 F.2d 633, 644 (2d Cir.1993.) "Thus, if there has been a lawful arrest and an immediately ensuing search is not justifiable as incident to the arrest, a motion to suppress the proceeds of the immediate search may nonetheless be denied if the contents would inevitably have been discovered in a permissible inventory search." *Id.* (citing *United States v. Jenkins,* 876 F.2d 1085, 1088–89 (2d Cir.1989); *United States v. Gorski,* 852 F.2d 692, 696–97 (2d Cir.1988)).

█ In his affidavit in support of his motion, Echevarria states that he was "in possession of the truck and the items therein and the boxes that were searched and seized by the police." (January 15, 2009 Aff. ¶ 5.) After Echevarria and Sanchez were arrested, the partially-opened box, as well as additional boxes, were transported to the Precinct and put in a secure room so that they could be inventoried. (Tr. 82, 88, 132–133.) The only boxes of marijuana searched by Officers Diaz and Irizarry, and subsequently marked as evidence in this case, are the boxes that were transported from the scene immediately subsequent to the defendant's arrest. (Tr. 84, 87–88, 135; GX–6.) One of these boxes had marijuana in plain view. The other boxes were in the defendants' possession and therefore were properly inventoried upon the defendants' arrests. *Thompson,* 29 F.3d at 65.

Even if, as defendants assert, some of the boxes came from inside the truck at a later point in the day, the NYPD was permitted to conduct an inventory search of the truck subsequent to the arrests because an inventory search of the vehicle was inevitable. *Perea,* 986 F.2d at 644. Accordingly, the motions to suppress the remaining boxes of marijuana are denied on that basis.

### C. The February 10, 2009 Arrest

### 1. Law Enforcement Had Probable Cause or Reasonable Suspicion To Initiate A Motor Vehicle Stop Upon Witnessing Echevarria's Traffic Violation

"An ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments." *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.1994) (footnote omitted) (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir.1993)). A violation of vehicle and traffic laws may give rise to a valid stop under the Fourth Amendment whenever the officers have probable cause or a reasonable suspicion, based on specific and articulable facts, of such an infraction. *Scopo*, 19 F.3d at 781. Even a minor traffic offense is sufficient to justify stopping the driver of a vehicle. *Id.* at 782 (quoting *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir.1990)). "It does not matter whether the stop was on account of the traffic violation, because reasonableness is evaluated from an objective standard." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Holeman*, 425 F.3d at 190 n. 1; *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir.1998) ("an observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation").

Here, as noted above, Trooper Murphy credibly testified that he observed a traffic violation. Accordingly, he was justified in stopping Echevarria's vehicle. *Scopo*, 19 F.3d at 782.

### 2. Echevarria Gave Valid Voluntary Consent to the Officers To Search His Truck

Although a warrant and probable cause are often necessary in order to render a search reasonable, "[i]t is ... well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See also Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.") (citing *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041); *Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005) ("One such exception [to the Fourth Amendment's protection against warrantless searches] is consent by a party whose property or person is to be searched.") (citing *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir.1995)).

There are no magic words that are needed to establish consent to a search. *See, e.g., United States v. Mire*, 51 F.3d 349, 351–52 (2d Cir.1995) (per curiam) (response of "take a look" constituted consent to search extending to containers within a bag). Rather, "the ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995) (internal quotation and citation omitted). In making that determination, courts ask "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801 (citations omitted).

Some of the factors that bear upon the voluntariness of the consent include "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had

refused to consent," *United States v. Lavan,* 10 F.Supp.2d 377, 384 (S.D.N.Y.1998) (citations omitted), as well as the length of detention and the nature of the questioning, *see United States v. Arango–Correa,* 851 F.2d 54, 57 (2d Cir.1988) (five-hour detention did not vitiate consent where defendant was well treated and "not subjected to the kind of intensive interrogation over many hours or days which would overwhelm the frightened prisoner"). No one factor is determinative. *See United States v. Crespo,* 834 F.2d 267, 271–72 (2d Cir.1987) (citing *Schneckloth,* 412 U.S. at 218, 93 S.Ct. 2041) (finding that defendant had validly consented to search even though defendant was under arrest and in custody, was handcuffed, and had not been told that he could refuse to consent).

▮ As is plainly evident on the video, Trooper Murphy spoke to Echevarria for approximately fifteen minutes, in English, and Echevarria gave every indication that he understood, including that he provided answers in English to questions on a variety of topics that required more than a yes or no response. Echevarria points to the fact that he was not told he could refuse to consent to a search of the truck (Br. at 10), but Trooper Murphy was under no obligation so to instruct him. *See Crespo,* 834 F.2d at 271–72. Echevarria also claims that the "manner and nature of Murphy's questions created a coercive atmosphere." (Br. at 10.) Having had the benefit of watching the actual interactions between Echevarria and Trooper Murphy on tape, I find that Trooper Murphy in no way created a coercive atmosphere. In fact, Trooper Murphy took pains to point out to Echevarria how he would legally be able to continue his trip and how to avoid getting docked pay when the traffic stop was over. (Tr. 36–37.) With regard to the other officers to whom Echevarria refers in further arguing that the environment was coercive (Br. at 12), those officers were behind the police car

and therefore out of view of Echevarria (and the video) prior to Echevarria's consent. (Tr. 63.)

Echevarria also points to two instances where he changed his answer when Trooper Murphy asked a question a second time, arguing that this shows Echevarria did not understand what Trooper Murphy was saying. (Br. at 4, 10.) In both of these instances Echevarria is speaking about an area of the truck where marijuana was ultimately found. Having reviewed the video, I ascribe Echevarria's changed answers to consciousness of guilt, not any inability to understand English. When asked equally complex questions, such as whom he worked for, what kind of cargo he was hauling, where he was to deliver it, and about his relationship with his co-driver, Echevarria spoke entirely in English and did not equivocate. (GX–1; Br. at 4.) Finally, Echevarria claims that he did not understand that he could get up when informed verbally in English, so Trooper Murphy had to use a hand gesture to show him. (Br. at 11.) The entire interaction to which Echevarria refers took place over ten seconds and is therefore no indication of whether Echevarria understood the oral direction prior to the hand gesture confirming it. (GX–1.)

What is plain, however, is that in response to being asked by Trooper Murphy if Trooper Murphy can search Echevarria's truck, Echevarria clearly said "yeah." Trooper Murphy then asked Echevarria to come to the front of the truck to get the keys, and Echevarria complied. After a nearly fifteen-minute discussion in which Echevarria was responsive to all questions in English, where Echevarria was not in handcuffs and no show of force was made, and Trooper Murphy acted in a courteous manner toward Echevarria, Trooper Murphy had a reasonable basis for believing that there had been consent to the search.

**338**

*Schneckloth,* 412 U.S. at 219, 93 S.Ct. 2041; *Lavan,* 10 F.Supp.2d at 384; *Arango–Correa,* 851 F.2d at 57.[6]

### Conclusion

For the reasons set out above, defendants' motions to suppress [dkt. nos. 30 and 36] are denied.

A pretrial conference shall be held on March 4, 2010 at 10:30 a.m. In order to permit defense counsel time to consult with defendants prior to the conference, time until the conference is excluded from calculation under the Speedy Trial Act in the interests of justice.

SO ORDERED.

**6.** Notably, approximately five months before being stopped by Trooper Murphy, Echevarria sought and was granted a modification of his bail conditions to allow him to travel outside of New York and Florida on the condition that he *"provide consent to the United States Attorney for the Southern District of New York and law enforcement agents to search any vehicle he is driving for his employer when traveling beyond the scope of his current travel restrictions."* (Bail modification so ordered by Magistrate Judge Gabriel W. Gor-

enstein on August 28, 2008, emphasis added.) Warrantless searches relying on similar search conditions have been upheld in the analogous contexts of parole and probation. *See generally Samson v. California,* 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Here, the recent bail modification lends further support to my conclusion that Echevarria understood and voluntarily consented to Trooper Murphy's request to search his truck.